[Cite as *Guagenti v. Guagenti*, 2017-Ohio-2706.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

BRIDGET C. GUAGENTI,

    PLAINTIFF-APPELLANT,          CASE NO.  1-16-47

    v.

MARK GUAGENTI, ET AL.,          O P I N I O N

    DEFENDANTS-APPELLEES.

Appeal from Allen County Common Pleas Court
Domestic Relations Division
Trial Court No. DR 2013 0514

**Judgment Affirmed**

Date of Decision:    May 8, 2017

APPEARANCES:

    *Jose M. Lopez* **for Appellant**

    *Andrew B. King* **for Appellee, Mark Guagenti**

**SHAW, J.**

{¶1} Plaintiff-appellant, Bridget C. Guagenti ("Bridget") appeals the September 7, 2016 Amended Judgment Entry/Decree of Divorce issued by the Allen County Court of Common Pleas, Domestic Relations Division, granting her complaint for a divorce from Mark Guagenti ("Mark"). On appeal, Bridget assigns as error (1) the trial court's determination that the assets in the Samuel J. Guagenti 2007 Irrevocable Trust did not constitute marital property subject to equitable division; (2) the trial court's application of the $150,000 combined income level cap in calculating Mark's child support obligation; and (3) the trial court's decision to award Bridget only $300,000 for Mark's financial misconduct during the divorce proceedings.

### *Relevant Facts*

{¶2} Bridget and Mark were married in 1992. Three children were born as issue of their marriage in 2000, 2002, and 2004.

{¶3} In 1996, Mark took a position as an office manager in the family business, C&G Distributing, Co., Inc., ("C&G Distributing") an S-corporation operating in the wholesale beverage business. Mark eventually became the Chief Operations Officer of the business drawing an upper management salary, but was not a shareholder of the corporation. Rather, the record reflects that Mark's father,

Samuel Guagenti, owned 33.3% of the corporate shares, along with three other individuals who owned the remaining shares.

*Samuel J. Guagenti 2007 Trust*

{¶4} In 2007, the shareholders of C&G Distributing began discussions of a possible sale of the corporation and considered estate planning matters attendant to their ownership interests. (See Atty. Pappas Depo. at 11-12). On October 11, 2007, Samuel Guagenti, as Grantor, executed the Samuel J. Guagenti 2007 Irrevocable Trust ("SJG 2007 Trust"). Mark was named Trustee. Another individual, who was not Mark, was also named as the "Special Trustee" under the terms of the Trust Agreement, "with respect to any stock or other equity interest of the trust in an entity that is a wholesaler of products of ANHEUSER-BUSCH INC., or any other brands, directly or through its affiliates * * *." (Samuel J. Guagenti 2007 Irrevocable Trust at p. 1). The Trust Agreement named Mark and his children as beneficiaries; specifically, it provided that "[t]he purpose of the Grantor [i.e., Samuel] in entering into this agreement is to effectuate a plan for the orderly, businesslike administration of the trust estate for the benefit of the Grantor's descendants, in particular the Grantor's son and the Grantor's son's children. [1] (*Id*.).

{¶5} The Trust Agreement further stated that the Trustee shall accumulate all income earned by the Trust, and permitted the Trustee to distribute portions of

---

[1] Section 23 of the Trust Agreement identifies the "Grantor's Son" as Mark G. Guagenti.

-3-

the accumulated income "to, among, or for" the beneficiaries' benefit "as the Trustee may from time to time deem appropriate to support, maintain, or provide for the health or education of such beneficiaries." (*Id*. at § 3(b)). The Trust Agreement specified that the Trustee could only invade the principal of the Trust with the consent of the "Protector Committee," which consists of "three individuals, acting by majority decision."[2] (*Id*. at §§ 3(b), 19(e)).[3] Thus, the Trust Agreement permitted Mark as Trustee to make distributions of the accumulated income to himself at his discretion, so long as the ascertainable standard outlined in § 3(b) was met and so long as Mark adhered to the fiduciary obligations set forth in the Trust Agreement. However, Mark's access to the SJG 2007 Trust's principal had to be approved by the Protector Committee.

*The SJG 2007 Trust's Purchase of Corporate Shares*

{¶6} In 2008, Samuel initially funded the SJG 2007 Trust with a contribution of $10,000 and the right to purchase his 33.3% stake in C&G Distributing. The same year, the SJG 2007 Trust borrowed $3,000,000 from Fifth-Third Bank to purchase Samuel's shares. Mark participated in the transaction in a fiduciary

---

[2] Section 19(e) of the Trust Agreement provides that "[a]n individual qualified to serve as a member of the Protector Committee shall be an individual qualified to serve as an Independent Trustee under this instrument or a descendant." Section 3(b) defines an "Independent Trustee" as a trustee who, generally speaking, is not a beneficiary or a contributor to the Trust and who is not appointed by a beneficiary or a contributor.
[3] The attorney who drafted the SJG 2007 Trust testified that the Trust Agreement terms were similar to the terms included in the generation skipping trust drafted for Samuel's brother, Francis, also a 33.3% shareholder of C&G Distributing prior to selling his shares to the trust bearing his name.

capacity as Trustee. The loan documents identified the SJG 2007 Trust as the "borrower" and C&G Distributing as the "guarantor." (See Third Party Defendant's Ex. D). As a result of the purchase, the SJG 2007 Trust owned 33.3% of the shares of C&G Distributing.

{¶7} As a shareholder of the corporation, the SJG 2007 Trust received distributions which were used to pay the interest on the three-million-dollar loan with Fifth-Third. Shortly after purchasing Samuel's share, the SJG 2007 Trust also became a member of C&G Investment Properties, LLC, which held titles to certain real property, including the real estate upon which C&G Distributing's distribution centers were located. Thus, the SJG 2007 Trust had two streams of income, the accumulation of which Mark, as Trustee, was entitled to distribute to himself and the other beneficiaries for support, maintenance, health or education: (1) income flowing from the S-corporation shares of C&G Distributing and (2) rental income from C&G Investment Properties, LLC.

*Sale to Anheuser-Busch*

{¶8} On June 12, 2013, the shareholders of C&G Distributing—the Virginia M. Cajacob 2007 Irrevocable Trust, the Francis J. Guagenti 2007 Irrevocable Trust, and the Samuel J. Guagenti 2007 Irrevocable Trust each entered into an agreement, through their respective trustees, for the sale of C&G Distributing's assets to Anheuser-Busch for $47,700,000, of which one third or $15,900,000 was

attributable to the shares held by the SJG 2007 Trust.[4] The SJG 2007 Trust paid Federal and State income taxes incurred from the transaction. As a term of the asset purchase agreement, the three senior managers of C&G Distributing, of which Mark was one, signed non-competition agreements and received a consulting fee for a period of three years.

### *Case Procedural History*

{¶9} On November 12, 2013, Bridget filed a complaint for divorce initiating this action. Bridget filed a motion to join the SJG 2007 Trust as Third Party Defendant, claiming that she was entitled to the assets contained in the Trust because the assets were property acquired by Mark during the marriage and the profits thereof were attributable in part to Mark's employment at C&G Distributing. Thus, Bridget claimed that the trust assets resulting from the sale of the business to Anheuser-Busch were subject to equitable division in the divorce.

{¶10} On April 15, 2015, the trial court held a two-day final divorce hearing. Prior to the hearing, the parties stipulated to a number of matters related to the custody of the children and the division of certain marital property, including the allocation of the marital residence to Bridget. The matters remaining for the trial court to resolve focused upon whether the assets of the SJG 2007 Trust were marital

---

[4] The record reveals that $3,000,000 of the total purchase price was held in escrow until 2014 as part of the terms of the sale. As of the final divorce hearing, the money was paid and transferred to an account under the name of C&G Distributing, which appeared to remain open for the purpose of winding down the corporation.

property, the equitable distribution of the remaining marital assets between the parties, the amount of spousal support to be awarded to Bridget, and the amount of Mark's child support obligation. At the final divorce hearing, the trial court heard from both Mark and Bridget, as well as several witnesses who testified about the nature of the assets in the SJG 2007 Trust and the circumstances surrounding the Trust's creation.

*The Trial Court's Decision*

{¶11} The trial court issued a decision on March 10, 2016. In a thorough and detailed opinion, the trial court outlined numerous reasons in support of its determination that "the creation of the Trust in and of itself is a separate entity and the assets contained within that Trust are * * * neither marital nor separate property. The assets are not property owned by either of the parties at the creation of the SJG Trust." (Doc. No. 153 at 7). Thus, the trial court concluded that the trust assets were property of a third party, i.e., the SJG 2007 Trust, and not subject to equitable division in the parties' divorce under R.C. 3105.171.

{¶12} However, the trial court did take the income distributions from the SJG 2007 Trust to Mark into consideration when devising an amount for spousal support and child support. The trial court noted that Mark earned an annual salary of $120,000 when he worked in upper management at C&G Distributing prior to the sale of the corporation's assets to Anheuser-Busch. As part of the purchase

agreement terms, Mark and the other two senior managers at C&G Distributing were given a consulting salary of $265,000 per year for a period of three years after the sale took place. The trial court found at the time of the final divorce hearing that "the income from the [SJG 2007 Trust] assets in total has been substantial and will be substantial in the future. Mark has, in compliance with the Trust, disbursed the income for his use as the primary beneficiary. In the first year this was approximately $330,000.00 he utilized in distributions and the Court would find that is an appropriate figure to utilize for income in calculating the spousal support and * * * the child support." (Doc. No. 153 at 13). Using this figure, the trial court ordered Mark to pay $5,000 per month in spousal support to Bridget for a period of eleven years. The trial court retained jurisdiction over the amount of spousal support, but not over the term of spousal support.

{¶13} The trial court noted that Bridget had worked in the past earning an annual salary of $85,000. However, the trial court took into account the fact that Bridget had been out of the workforce for several years and imputed a minimum wage income to Bridget for the purposes of its child support calculation. As stipulated by the parties, Bridget was named the residential parent of the three minor children and Mark was given visitation according to the local rule. Mark agreed to pay the cost of the children's private education and to provide health insurance for the children. The trial court further determined that "[t]his Court cannot find there

has been any establishment that the needs and standard of living of the children are in excess of the child support schedule and this Court consequently cannot find that it would be unjust or inappropriate and not in the best interest of the children to order the [child support] amount at the $150,000.00 level." (Doc. No. 153 at 15).

{¶14} Accordingly, the trial court applied the $150,000 combined income level cap to its child support calculation and ordered Mark to pay $24,532 annually to Bridget in child support, or $681.45 per child when health insurance is being provided. If health insurance is not being provided, the trial court ordered Mark to pay $685.37 per child and an additional total of $971.00 per month as and for cash medical support.

{¶15} The trial court assessed the value of the marital property awarded to each party and divided by stipulation, which included the value of vehicles, investment accounts, insurance policies, and Mark's personal interest in various business ventures. Mark was ordered to pay Bridget $179,363.56 to equalize the distribution of these assets. The trial court also ordered Bridget to be entitled to the sum of $151,212, plus or minus any gains or loss associated therewith from April 15, 2015 to equalize the value of the parties' IRA accounts.

{¶16} Upon Bridget's motion, the trial court also found that Mark had engaged in financial misconduct by failing to timely and accurately disclose information with respect to assets in the case which resulted in considerable delay

in the proceedings.[5]   As a result, the trial court ordered Mark to pay Bridget $300,000, in addition to the martial distributive awards previously mentioned, based upon "Mark's failure to disclose assets and continual usurpation of the discovery process in this case and his flagrant refusal to comply." (Doc. No. 153 at 16).  The trial court also ordered Mark to pay Bridget's attorney fees associated with the prosecution of a contempt order based upon discovery violations in the amount of $1,458.75, as well as the total amount of attorney fees Bridget incurred in the underlying divorce action, which totaled $90,858.31 at the time of the trial court's decision.[6]

{¶17} The trial court's decision was incorporated and implemented in its April 6, 2016 Judgment Entry/Decree of Divorce.  Bridget filed an appeal of that judgment, which was dismissed by this Court for a lack of a final appealable order due to the trial court's indication in the judgment entry that it intended to take further action with respect to the amount of attorney fees awarded to Bridget.  Accordingly, the cause was remanded to the trial court to resolve this pending matter.

---

[5] It should be noted that throughout the discovery phase of the case Mark failed to comply with the discovery deadlines, despite Bridget obtaining multiple orders from the trial court compelling his compliance, by neglecting to fully divulge financial statements and documents when required.  This resulted in a considerable amount of delay in the case coming to a final hearing and in Bridget incurring a substantial amount of attorney fees related to discovery and pursuing contempt matters.   Mark also failed to comply with the trial court's restraining order as it related to the parties' finances.  Specifically, Mark purchased a condo and a luxury sports car while the divorce proceedings were pending.

[6] The trial court credited the $25,000 Mark had previously advanced to Bridget for attorney fees against the $90,858.31, for a total amount ordered of $65,858.31 as of March 31, 2015.

{¶18} On September 7, 2016, the trial court issued an Amended Judgment Entry/Decree of Divorce addressing the outstanding issue of attorney fees and ordering Mark to "pay the additional sum of $34,830.20 for attorneys fees and litigation expenses for both the Final Divorce Hearing and the Motion for Citation in Contempt that had been litigated." (Doc. No. 168 at 7).

{¶19} Bridget filed this appeal, asserting the following assignments of error.

**ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT ERRED AND ACTED CONTRARY TO LAW WHEN IT DETERMINED THAT APPELLEE, MARK GUAGENTI'S, INTEREST IN THE SAMUEL J. GUAGENTI 2007 IRREVOCABLE TRUST DID NOT CONSTITUTE MARITAL PROPERTY SUBJECT TO DIVISION.**

**ASSIGNMENT OF ERROR NO. 2**

**THE TRIAL COURT ERRED IN SETTING THE CHILD SUPPORT OBLIGATION AT THE $150,000.00 LEVEL.**

**ASSIGNMENT OF ERROR NO. 3**

**THE TRIAL COURT ERRED IN ONLY AWARDING $300,000.00 FOR HUSBAND'S FINANCIAL MISCONDUCT.**

*First Assignment of Error*

{¶20} In her first assignment of error, Bridget claims that the trial court erred in determining that the SJG 2007 Irrevocable Trust did not constitute marital property subject to equitable division under R.C. 3105.171(B). Specifically, Bridget argues that the trial court erred in determining that the appreciation in the value of

the trust assets—i.e., the value of C&G Distributing stock from the time of the Trust's acquisition of Samuel's shares to the sale of the corporation's assets to Anheuser-Busch, which Bridget argues is traceable to Mark's employment as a manager, did not constitute marital property. Bridget also maintains that Mark's authority under the Trust Agreement as Trustee and primary beneficiary was tantamount to outright ownership of the Trust and therefore the 2007 SJG Trust assets should be considered marital property on this basis.

**{¶21}** Before we address Bridget's arguments on appeal, we must first review the evidence in the record regarding Mark's interest in the SJG 2007 Trust. Both Mark and Bridget presented expert testimony offering differing opinions characterizing the nature of Mark's interest in the SJG 2007 Trust.

*Mark's Evidence Regarding the SJG 2007 Trust*

**{¶22}** Mark presented the testimony of Robert Pappas, the attorney who drafted the SJG 2007 Irrevocable Trust.[7] Mr. Pappas testified that he has maintained a private legal practice since 1984 focusing on the areas of business, tax, estate planning and probate. Mr. Pappas recalled meeting with the individual owners of C&G Distributing, including Samuel Guagenti, Mark's father in 2007. Mr. Pappas met with Samuel several times before the execution of the Trust Agreement

---

[7] The record reflects that a waiver of attorney-client privilege was obtained in order for Mr. Pappas to testify.

establishing the 2007 SJG Trust. He explained that the purpose of these meetings was to discuss the creation of the 2007 SJG Trust as an estate planning device.

**{¶23}** Mr. Pappas testified that the 2007 SJG Trust expressed Samuel's intent to provide for Mark and Mark's descendants on a long term basis for at least two generations. There was no provision identifying Mark's spouse as a beneficiary. Mr. Pappas explained that "the purpose of the Trust was to make sure that these assets were owned and passed in the way Samuel J. Guagenti wanted them to be." (Doc. No. 183 at 98). In other words, Samuel as the Grantor "had the right to create the rules under which that Trust was to operate." (*Id*. at 145).

**{¶24}** Mr. Pappas confirmed that the 2007 SJG Trust was not initially funded at the time of execution, but that a contribution agreement between Samuel as "Grantor" and Mark as "Trustee" of the SJG 2007 Trust was executed the same day as the SJG 2007 Trust was created. The contribution agreement stated that the "Grantor intends to contribute to the Trust an initial contribution of cash and rights to acquire stock in C&G Distributing Co., Inc." (3d Party Def. Ex B). A document entitled "Agreement for Purchase of Sale and Shares of C&G Distributing Co., Inc.," which was also executed the same day the SJG 2007 Trust was created, provided the terms and conditions for the SJG 2007 Trust to purchase Samuel's 41 shares of C&G Distributing for $3,000,000.[8] (3d Party Def. Ex. C). In addition to

---

[8] At oral argument, Bridget's counsel claimed that Mr. Pappas testified that the 2007 SJG Trust's right to acquire the C&G Distributing stock had a zero value because that was the value assigned to the right to

the right to acquire his shares in C&G Distributing, Samuel later contributed $10,000 to the 2007 SJG Trust in 2008, which all parties agree was a gift to the 2007 SJG Trust.

{¶25} Mr. Pappas refuted Bridget's counsel's characterization that the SJG 2007 Trust was intended to be a "freely distributable trust" to Mark. (Doc. No. 183 at 144). Rather, Mr. Pappas pointed to the provisions of the Trust Agreement, which only permitted Mark as Trustee to distribute the accumulated income to himself and the other beneficiaries if the ascertainable standard contained in the Trust Agreement was met. The Trust Agreement further provided that, when Mark was acting as Trustee, the principal of the 2007 SJG Trust was only to be distributed to the beneficiaries upon approval by the "Protector Committee." Mr. Pappas relayed that it is not unusual for the Trustee to also be a beneficiary under a trust and that is the case in an estimated ninety percent of the trusts he drafts. He further explained that Mark as Trustee is held to a fiduciary obligation and the 2007 SJG Trust provides standards to which he must adhere. Mr. Pappas noted that the 2007 SJG

---

purchase the shares on an IRS gift tax return filed by the Trust. A close reading of Mr. Pappas' testimony reveals that he consistently disputed Bridget's counsel's attempt to oversimplify the matter and blur the values which were considered for two different purposes. Specifically, Mr. Pappas maintained that the Trust's right to acquire Samuel's shares did have a "value" higher than zero in the sense that Samuel would not have sold those share to anyone else, but that the value for IRS gift tax purposes was zero.

Trust also provides for an "Independent Trustee" other than Mark to be named in which case the power of distribution to the beneficiaries is even broader.[9]

**{¶26}** In March of 2008, Mr. Pappas assisted Samuel in the transaction in which he sold his shares of C&G Distributing to the SJG 2007 Trust by drafting the pertinent documents related to the purchase. As previously discussed, the SJG 2007 Trust's purchase of Samuel's interest in C&G Distributing was financed by a $3,000,000 loan obtained from Fifth-Third Bank for a term of seven years. The commitment letter from the lending institution identified SJG 2007 Trust as the "Borrower or Debtor" and C&G Distributing as the "Guarantor." (3d Party Def. Ex. D). According to Mr. Pappas, which the record reveals is substantiated by the loan documents, there were no personal guarantees on the loan and Mark only participated in the transaction in a fiduciary capacity as Trustee of the "Borrower" and at no time ever individually owned any shares of C&G Distributing during the transaction. Notably, the "protector committee" was required to approve any borrowing by the Trust, which it did in this transaction with Fifth-Third Bank. (3d Party Def. Ex. D).[10]

---

[9] Section 3(b) of the Trust Agreement further provides that if an Independent Trustee is acting on behalf of the Trust, then the ascertainable standard for income distributions is what the Independent Trustee believes is in "best interest" of the beneficiary. *See*, *supra*, footnote 2. Furthermore, the Trust Agreement appears to state that if an Independent Trustee is appointed, there is no requirement that the "Protector Committee" approve of distribution of the Trust principal to the beneficiaries.

[10] Mr. Pappas' testimony established that this transaction was not isolated to Samuel's shares and estate planning wishes, but were part of a larger, collective plan of the C&G Distributing shareholders to transfer ownership of the business. Specifically, the record indicates that the corporate minutes, admitted by stipulation of the parties as exhibits, demonstrated that the four individual shareholders of the stock in C&G Distributing adopted a resolution to guarantee loans in the amount of $3,000,000 to each the Francis J.

{¶27} Mr. Pappas testified that in 2008 the limited liability company, C&G Investment Properties, LLC, was created. The three members of the LLC were the Virginia M. Cajacob 2007 Irrevocable Trust, the Francis J. Guagenti 2007 Irrevocable Trust, and the Samuel J. Guagenti 2007 Irrevocable Trust. The titles to various real estate holdings were transferred to C&G Investment Properties, some of which were to the land upon which C&G Distributing had its distribution centers in Lima and Versailles. The rent from these properties provided a stream of income for the SJG 2007 Trust, in addition to the distributions the SJG 2007 Trust received as shareholder of the C&G Distributing stock.

{¶28} Mr. Pappas also counseled Samuel on the transaction involving the sale of the corporation's assets to Anheuser-Busch in June of 2013. He explained that while out of state attorneys for the buyer were lead counsel, he assisted with the navigation through applicable Ohio law and was aware of each step of the transaction. In June of 2013, Anheuser-Busch purchased the stock outright and the real estate held by C&G Investment Properties was purchased at a later time. The SJG 2007 Trust received its share of the proceeds from both of these sales.[11]

---

Guagenti 2007 Irrevocable Trust and the Samuel J. Guagenti 2007 Irrevocable Trust in order to finance the sale of their respective shares to these trusts. (3d Party Def. Ex. I)

[11] The parties stipulated that SJG 2007 Trust paid taxes on the proceeds from the sale in the amounts of $2.9 million to the Federal Government and $350,000 to the State of Ohio. Plaintiff's Ex. 21, which is the 1041 Income Tax Return for the year 2013 filed by the SJG 2007 Trust indicates that another $1,095,663 was paid in expenses associated with the sale of C&G Distributing's assets to Anheuser-Busch, which included attorney fees, brokerage fees, and distributions rights. (*See* Doc. No. 183 at 190).

{¶29} Mr. Pappas' testimony established that under the terms of the 2007 SJG Trust Agreement there was a clear distinction between Mark's capacity as Trustee and Mark's individual capacity as beneficiary, and that Mark never personally owned any of the shares in C&G Distributing. However, Mr. Pappas declined to opine whether the Trust was separate or marital under R.C. 3105.171 due to the fact that his area of expertise did not encompass domestic relation matters.

{¶30} Mark, in accordance with his powers as Trustee, placed most of the proceeds from the sale into investment accounts. Mr. Pappas assisted Mark in purchasing annuities for the beneficiaries of the SJG 2007 Trust, but did not have any personal knowledge of the other investments made with the Trust assets.[12] Mark presented additional evidence regarding the Trust assets after the sale of C&G Distributing to Anheuser-Busch.

---

[12] Mr. Pappas testified in some detail about the creation of a "decanting trust" entitled The Guagenti Family Trust, which was executed on August 23, 2013, pursuant to R.C. 5808.18. According to Mr. Pappas, this trust was created because the annuity company had issues with Samuel's life being the proposed measuring life for the annuities to be purchased by the SJG 2007 Trust. Thus, The Guagenti Family Trust was created and named Mark as a grantor for the sole purpose of purchasing the annuities. Mr. Pappas explained that creating this specific type of trust allows for the Trustee holding property under one trust agreement to transfer the assets to a second trust which benefits the same group of people under the first trust. He noted that "the provisions in the Guagenti Family Trust are for Mark and his descendants, just like [the ones provided in] the Sam Guagenti Trust are." (Doc. No. 183 at 118). Mr. Pappas further explained that the sole purpose for creating this decanting trust was to obtain the annuities and that if the Trustee decided to no longer hold those annuities, he would then advise the Trustee to decant the assets back to the original trust because there is no reason to have two trusts for the same purpose. While Bridget did not specifically assign error to the creation of this decanting trust on appeal, nor present any evidence opposing Mr. Pappas' testimony, we note that there seemed to be some confusion as to the nature of this trust on Bridget's behalf throughout the proceedings and an imputation that this action somehow transmuted the nature of the trust assets used to buy the annuities. However, there is nothing in the record to substantiate such an allegation.

-17-

{¶31} Kimberly Chase, an Auditor with Rea & Associates, Inc., an accounting firm, stated that she completed a balance sheet as part of a general audit performed on the SJG 2007 Trust.[13] She testified that as of the end of 2014, the SJG 2007 Trust had one bank account containing a substantial amount of cash and also owned three investment accounts with Lincoln Financial Group, JP Morgan Chase, and Northwestern Mutual, which totaled approximately $7.9 Million. Ms. Chase also reviewed disbursements from the SJG 2007 Trust account to Mark's personal account and the joint account, held by both Mark and Bridget, for the period of January 2013 through December 2014. She noted that there was a purchase of a condominium which was financed through a loan directly to the Trust. Ms. Chase clarified that the Trust assets were not invaded but merely "pledged" to effectuate this purchase. (*See* Doc. No. 183 at 161).[14]

{¶32} Mark provided additional testimony regarding his purchase of the condo. Mark purchased a condo in 2014 after the divorce was filed by using a line of credit from his personal account secured against the SJG 2007 Trust account. Mark's testimony and the exhibits admitted into evidence revealed that on

---

[13] The balance sheet prepared by Ms. Chase was not admitted as an exhibit based upon the trial court sustaining Bridget's counsel's objection on the ground that he had not received a copy of the exhibit prior to the day of the final divorce hearing. Accordingly, Ms. Chase testified from her personal knowledge of the Trust assets in creating the balance sheet.

[14] Section 9(d) of the Trust Agreement specifically authorizes that the "Trustee may, upon such terms and conditions and for such considerations as the Trustee deems acceptable, grant options respecting, sell or exchange at public or private sale, pledge, hypothecate, mortgage, lease, donate, abandon, or otherwise dispose of, deal with, or encumber (for any period of time whatsoever, whether or not ending during the term of the trust) any real or personal property comprising part of the trust estate."

September 11, 2014, he received a cashier's check in the amount of $544,133.81 from the SJG 2007 Trust's bank account to secure payment for the condominium. (Pl. Ex. 3f). On the same day, he received a cashier's check from his personal account at Chase bank and repaid the money that he utilized to obtain the personal line of credit to the Trust account. (Pl. Ex. 3e). Mark testified that there is no mortgage on the condominium because he is personally making the payments, not the Trust, on the line of credit he obtained from his bank. (Doc. No. 182 at 106). Notably, there was no evidence in the record establishing that the amounts that Mark pledged from the SJG 2007 Trust bank account invaded the principal of the Trust or exceeded his authority as Trustee to make distributions of the accumulated income to himself as a beneficiary for his support, maintenance, health or education. And in fact the parties at trial stipulated that this transaction did not invade the Trust principal. (Doc. No. 183 at 37-38).

{¶33} Mark also presented the testimony of Tiffany Crawford, a tech supervisor with Rea & Associates Inc., with a background in accounting and a licensed attorney. Ms. Crawford assessed the disbursements from the SJG 2007 Trust for the time period of 2008 to 2014. According to Ms. Crawford, "if a check was written from the Trust, I determined to whom the check was written to [sic]." (Doc. No. 183 at 177). She recalled that during this timeframe, checks were written to Mark, Lincoln Financial, Northwestern Mutual and JP Morgan Chase.

Specifically, she testified that a total of $1,600,000 was disbursed to Lincoln Financial, a total of $3,000,000 was disbursed to Northwest Mutual, and a total in the amount of $1,750,000 was disbursed to JP Morgan Chase.

{¶34} Ms. Crawford discussed Defendant's Exhibit S, a compilation of draft tax returns for the year 2014 prepared for Mark and Bridget to file jointly, as well as draft tax returns for the 2007 SJG Trust and Mark's other business entities. However, Bridget's counsel objected to the admission of the exhibit due to his claim that he had not seen these items prior to the final hearing and had not been given the opportunity to independently verify the accuracy of the document. The trial court sustained the objection for the documents related to 2014 and permitted Mark's counsel to question Ms. Crawford regarding the 1041 tax forms for the 2007 SJG Trust for the years 2008 to 2013 because those had already been admitted as exhibits in Bridget's case. Thus, the 2014 draft joint tax returns were not admitted as evidence. (*See* Doc. No. 183 at 173).

{¶35} However, the trial court permitted Ms. Crawford to testify to her personal knowledge obtained from working with those documents. She specifically recalled that on the joint tax returns the income sources of both parties were included, which reflected investment income, capital gain income, and Mark's consulting income. The record demonstrates that this information was only significant to the parties at the hearing regarding the allocation of a certain tax credit,

in the amount of $34,628 from 2013, that remained to be allocated in the property settlement.

*Bridget's Evidence Regarding the SJG 2007 Trust*

{¶36} Bridget presented the testimony of James Kordik, a CPA and licensed attorney whose legal practice focused on estate planning. Mr. Kordik surmised that the reason for Samuel creating the SJG 2007 Trust was for income planning purposes.[15] Mr. Kordik stated his opinion that all the funds from C&G Distributing stock constituted marital property under R.C. 3105.171(A)(3)(a). In support of his opinion, Mr. Kordik attributed the appreciation of the C&G Distributing stock value to Mark's labor and effort in his upper management position at the company until 2013. Mr. Kordik also stated that he reviewed the Trust Agreement establishing the SJG 2007 Trust and made generalized statements regarding Mark's powers as Trustee under the Trust Agreement to make distributions to the Trust beneficiaries, in particular to himself as primary beneficiary, and characterized Mark has having "near complete" control of the Trust assets. (Kordik Report, Pl.'s Ex. 1 at 4). Mr. Kordik minimized the authority of the "Protector Committee" by loosely referring

---

[15] We note that the record reflects that the SJG 2007 Trust made an ESBT election on its federal tax status, which Mr. Kordik claimed was for the purpose to avoid paying state income tax rather, than a method to protect third party property. However, Mr. Pappas, the attorney who drafted the SJG 2007 Trust and filed the tax returns for the years 2008 and 2009, disputed this characterization on cross-examination stated that the ESBT election was in this instance made as an estate and gift tax planning device, not as an income tax planning device. Mr. Pappas' clarified that an "ESBT is an election that a trust can make so that it can hold stock in a S corporation, even though it has more than a single beneficiary." (Doc. No. 183 at 134).

to distributions that Mark made as Trustee from the SJG 2007 Trust for his and his family's support, maintenance, health and education.

**{¶37}** For example, Mr. Kordik highlighted distributions made by Mark as Trustee for the purchase of a vehicle ($45,000), a remodel of a bathroom in the marital home ($50,000), the purchase of sports equipment including a 4-wheeler ($16,000), and an investment for a business partially owned by Mark ($300,000), all of which the record indicates was also deemed marital property and included in the trial court's equitable division thereof. There were also payments made from the Trust account for the children's private school tuition, country club dues, and political contributions.

**{¶38}** However, it should be noted that in drawing his conclusion with respect to the marital character of the SJG 2007 Trust, specifically the proceeds of the C&G Distributing stock, Mr. Kordik did not discuss when these distributions were made and whether they exceeded Mark's authority as Trustee to distribute the accumulated income to the beneficiaries, including himself, for support, maintenance, health, and education. Rather, Mr. Kordik's opinion gave little regard to the fact that Samuel created the SJG 2007 Trust with the intent of selling his shares of C&G Distributing to the Trust. Where Mr. Pappas' testimony appeared to emphasize the third party nature of this transaction, Mr. Kordik viewed Mark's

authority as Trustee as giving Mark outright ownership rights to the assets of the Trust.

{¶39} Thus, Mr. Kordik opined that Mark's participation in the transaction as Trustee in acquiring Samuel's shares in C&G Distributing was no different than if Mark "would have received [the shares] as an owner of a corporation or an LLC or himself individually. Under any of the foregoing arrangements, he could have purchased, owned and sold the C&G Distributing Co. stock." (Kordik Report, Pl.'s Ex. 1 at 5). Accordingly, Mr. Kordik stated that "in substance Mark Guagenti should be treated as the owner of the C&G Distributing Co. stock during the marriage." (*Id.*).

{¶40} Bridget also presented the testimony of David Fortney, a Certified Public Accountant. Mr. Fortney prepared a report summarizing Mark's and Bridget's personal assets. Specifically, he created summaries detailing the disbursements from the SJG 2007 Trust from March of 2008 through February of 2014. According to Mr. Fortney, the SJG 2007 Trust had a balance of $4,778,011.17. He noted that in addition to the substantial amount of funds that were transferred into three investment accounts (Northwestern Mutual, JP Morgan Chase, and Lincoln Financial Group), there were also two primary accounts that received distributions from the Trust. The first was a joint checking account belonging to Mark and Bridget to which $1,674,000 was transferred from the Trust

during this nearly six-year timeframe, and the other was a checking account under Mark's name to which $405,000 was transferred from the Trust during this relevant time period. Mr. Fortney opined that these funds transferred from the Trust into the parties' joint checking and Mark's separate checking account were "commingled" funds.

{¶41} With regard to the income accumulated by the SJG 2007 Trust, Mr. Fortney agreed that prior to the sale of C&G Distributing's assets to Anheuser-Busch, in June of 2013, two streams of income were derived from the shareholder distributions from the corporate stock and the rental income from C&G Investment Properties. He further acknowledged that prior to the sale to Anheuser-Busch the corpus of the SJG 2007 Trust consisted of the land held by C&G Investment Properties LLC, the C&G Distributing Stock purchased from Samuel, and the $10,000 gifted by Samuel.

{¶42} In tracing the disbursements from the SJG 2007 Trust account to the jointly held checking account and Mark's personal checking account, Mr. Fortney never identified any disbursement from the SJG 2007 Trust account as exceeding the accumulated income. In other words, there was no testimony indicating that Mark as Trustee exceeded the scope of his authority under the terms of the Trust Agreement in distributing the accumulated income for his or his children's support, maintenance, health, and education, nor was there any testimony that the principal

of the Trust was invaded in making these disbursements from the SJG 2007 Trust account.

### The Trial Court's Ruling: The SJG 2007 Trust Belongs to a Third Party

**{¶43}** It is clear from the trial court's March 10, 2016 decision that it carefully considered the above testimony offering differing characterizations of Mark's property interest in the SJG 2007 Trust, in determining whether the Trust itself was subject to equitable division in the divorce.

**{¶44}** The trial court addressed Bridget's argument equating the SJG 2007 Trust to that of a corporation or LLC created during the marriage and noted that "the analysis does not take into consideration [that] the SJG Trust was created by a third party and its a separate viable legal entity in and of itself." (Doc. No. 153 at 5). The trial court highlighted Mr. Pappas' testimony on the circumstances surrounding the creation of the SJG 2007 Trust and noted that the Trust was created by a third party—Samuel J. Guagenti— "to accomplish the purchase of the stock by the SJG Trust for the benefit of the beneficiaries of the SJG Trust." (*Id*. at 6).

**{¶45}** The trial court further considered the position of Bridget's expert Mr. Kordik on Mark's individual ownership of the Trust assets due to the authority conferred to him as Trustee while also being the primary beneficiary and found that:

> **Merely because Mark Guagenti serves in both of those capacities, as well as an officer of the corporation, C&G Distributing Company, Inc., we cannot automatically discount the intent of**

> **Samuel J. Guagenti in formulating the Trust as set forth in the Trust purpose to "effectuate a plan for the orderly business like administration of the Trust Estate for the benefit of the Grantor's descendant's, in particular the Grantor's son and the Grantor's son's children."  The comparisons to a corporate entity that is created during the term of a marriage or even prior to marriage and ownership of stock of that corporate entity by a husband or wife during the marriage and the proposed inclusion in that corporation of assets that would otherwise be marital can be easily differentiated from the current creation of the Trust by a third party, father of Mark Guagenti.**

(Doc. No. 153 at 6).

{¶46} Thus, the trial court found evidence establishing Samuel's intent, including the fact that the SJG 2007 Trust was intended to benefit at least two generations of Samuel's descendants and that similar trusts were created by other shareholders of C&G Distributing with the pending sale to Anheuser-Busch in mind.  The trial court also considered the specific trust provisions contained in the document creating the SJG 2007 Trust.  Specifically, that "Mark has unfettered right to distribute the income of the Trust, but must obtain the consent [] from the protector committee before distributing the principal of the trust.[16]"  (Doc. No. 153 at 7).

---

[16] Moreover, as previously indicated the 2007 SJG Trust provisions clearly make a distinction between the power conferred to Mark as Trustee as opposed to an Independent Trustee by giving the latter broader power to distribute the accumulated income *and* principal to the beneficiaries.  If the 2007 SJG Trust was meant to be a "freely distributable trust" as Bridget contends, then there would be no need for this difference in Trustee authority.

{¶47} The trial court concluded that based upon the evidence in the record establishing the factual circumstances underpinning the creation of the SJG 2007 Trust and the provisions limiting Mark's access to the principal that "the assets contained within that Trust are * * * neither marital or separate property. The assets are not property owned by either of the parties at the creation of the SJG Trust." (*Id.*)

{¶48} The trial court also reviewed whether Mark had engaged in any conduct inconsistent with the terms of the Trust Agreement, in which he exceeded the scope of his authority as Trustee or which indicated collusion for a dubious purpose to defraud Bridget that would somehow transmute the third party character of the SJG 2007 Trust to make it subject to equitable distribution under R.C. 3105.171. The trial court carefully examined the evidence and concluded that:

> **There was no indication that the money distributed to the Samuel J. Guagenti Trust, which was then applied to the three million dollar loan, was a diversion of any funds normally paid to Mark Guagenti as an employee or officer of the corporation. In fact, evidence indicated that like distributions were made to other stock owners, who were also trusts, purchasing stock by trusts created by two other previous owners of the C&G Distributing Company, Inc. stock.**
>
> **There was no evidence to indicate this distribution of funds constituted the redirection of modification of any distributions that Mark would have otherwise individually been entitled to.**
>
> **\* \* \***

> **In this case, the Trust itself defines the parameters within which the trustee/beneficiary must operate and there is absolutely no evidence to establish that Mark Guagenti violated any of the terms of the Trust in any regard[.]**

(Doc. No. 153 at 8).

{¶49} The trial court then turned to the parties' arguments regarding the application of R.C. 3105.171 and whether the SJG 2007 Trust is subject to equitable division in the divorce.

> **As all counsel have indicated in their references to [R.C.] 3105.171, marital property consists of all real and personal property that is <u>OWNED</u> (emphasis added) by either or both of the spouses. The creation of the Trust and the purchase of the stock, without any consideration as to how that purchase was accomplished, is not marital property, nor is it the separate property of one of the parties.**

(Doc. No. 153 at 7-8) (emphasis sic).

{¶50} Accordingly, the trial court determined that the SJG 2007 Trust was not subject to division in the parties' divorce and, therefore, that the statutory definitions of marital and separate property set forth in R.C. 3105.171 did not apply to the Trust itself.

### *Standard of Review*

{¶51} In a divorce proceeding, the division of the parties' property is governed by R.C. 3105.171. The trial court must first determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B). This is done under the manifest weight of the evidence standard of review. *Welly v. Welly*,

3d Dist. Seneca No. 13–15–15, 2015-Ohio-4804, ¶ 34. Manifest weight "concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Ohmer v. Renn–Ohmer*, 12th Dist. Butler No. CA2012-02-020, 2013-Ohio-330, ¶ 36.

**{¶52}** In a manifest weight analysis, the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Krohn v. Krohn*, 6th Dist. Wood No. WD-16-010, 2016-Ohio-8379, ¶ 11.

**{¶53}** "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21.[17]

### *Discussion*

**{¶54}** Bridget's argument on appeal that the trial court erred in finding that the SJG 2007 Trust is not subject to equitable division is premised upon her interpretation of the language in R.C. 3105.171(A)(3)(a)(i)-(iii), which statutorily defines marital property as the following:

> **(3)(a) "Marital property" means, subject to division (A)(3)(b) of this section, all of the following:**

---

[17] For the reasons that follow, we decline to accept Bridget's position on appeal that this issue presents a question of law that must be reviewed *de novo*.

> **(i)    All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;**
>
> **(ii)   All <u>interest</u> that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;**
>
> **(iii) Except as otherwise provided in this section, <u>all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage</u>[.]**

R.C. 3105.171(A)(3) (emphasis added).

**{¶55}** Bridget argues that the trial court erred in narrowly construing the scope of marital property under R.C. 3105.171(A)(3) to only real property or personal property *owned* by a spouse.  Bridget maintains that the SJG 2007 Trust falls under the purview of R.C. 3105.171 for two primary reasons.

### 1.    *Middendorf v. Middendorf*

**{¶56}** Bridget's first argument focuses upon the proceeds from the sale of C&G Distributing stock, which makes up the vast majority of the value of the Trust's assets.   Specifically, she argues that the appreciation in the value of the C&G Distributing stock contained in the SJG 2007 Trust is attributable to Mark's employment at C&G Distributing during the marriage.   In *Middendorf v.*

*Middendorf*, the Supreme Court of Ohio held that "[u]nder R.C. 3105.171, an increase in the value of separate property due to either spouse's efforts is marital property." *Middendorf*, 82 Ohio St.3d 397, 400, 1998-Ohio-403, syllabus.

**{¶57}** In *Middendorf*, Husband was a co-owner and a livestock buyer for Middendorf Stockyard Company, Inc. when he married Wife. *Middendorf*, 82 Ohio St.3d at 397. There was no dispute that Husband's interest in the stockyard company was his separate property. *Id.* After six years of marriage, the parties separated. *Id.* The Supreme Court engaged in a two-step analysis under R.C. 3105.171(A)(3)(iii) to determine whether any appreciation of the value in the stockyard company was marital property subject to division in the divorce. First, the Court determined that competent credible evidence, by way of expert testimony, established that the stockyard company increased in value by $108,541 during the six years the parties were married. Second, the Court reviewed evidence demonstrating that the increase in value of the stockyard company was due to labor, monetary or in-kind contribution by Husband. *Id*. at 401. This evidence included the nature of the business and Husband's involvement in management. *Id*. at 402.

**{¶58}** The Supreme Court found that record showed no abuse of discretion in the trial court's and appellate court's findings that " 'the increase in value of Middendorf Stockyard Company was the direct result of the pivotal role which [Husband] played in the management of the company during the course of the

marriage' and that [Husband] 'played a vital role in the management of the Stockyards. * * * [He] clearly dedicated himself to his work, spending significant amounts of time working to keep his business profitable in an increasingly risky market.' " *Middendorf*, 82 Ohio St.3d at 402. Accordingly, the Supreme Court found that, despite the fact that Husband's ownership in the stockyard was separate property, the record supported the conclusion that the appreciation in the value of the stockyard during the parties' marriage was "due" to Husband's labor and efforts and therefore was marital property subject to division under R.C. 3105.171(A)(3)(iii). *Id*. at 403.

{¶59} The trial court specifically addressed Bridget's *Middendorf* argument in its decision.

> **Bridget argues that the contribution of Mark Guagenti to the corporation C&G Distributing, Inc. during the course of the marriage between the purchase of the stock in March of 2008 and its ultimate sale to Anheuser-Busch in June of 2013 resulted in an increase of twelve million six hundred and sixty-six thousand six hundred and sixty-six dollars and sixty-seven cents [$12,666,666.67] in the value of the stock purchased by the Trust and therefore that increase in the value should be marital in accordance with *Middendorf v. Middendorf*, 82 Ohio St.3d 397 (1998).**
>
> **First of all, once again we have a situation where the Trust is a separate entity whereas in *Middendorf* or such cases one marital party owned the interest in the business entity, that being a separate interest, but there was enhancement to the business entity during the course of the marriage that was not passive in nature, causing the courts in those cases to determine that increase should be a marital asset subject to division.**

&#42; &#42; &#42;

**Even if owned by one or more of the parties, it would appear that there was no "business" reason for the increase in the value of the stock. While Mark testified he was a valuable contributing factor to the ongoing business, from the purchase of the stock by the SJG Trust until the sale to Anheuser-Busch, there was no demonstrative increase in the sales; there was no evidence of change in market shares, increased distribution territory or acquisition of assets. Mark testified the business stayed the same during this time and there was no conflicting evidence. In short, the evidence indicated that the SJG Trust purchased a good business that continued on basically the same pace so long as management continued to distribute product efficiently.**

(Doc. No. 153 at 9).

{¶60} Notably, the trial court's observation regarding the lack of evidence in the change of value of C&G Distributing between the time Samuel sold his shares to the SJG 2007 Trust and the asset purchase by Anheuser-Busch is accurately reflected in the record. At the final divorce hearing, Bridget only presented the testimony of Mr. Kordik who offered an opinion simply reiterating the principle set forth in *Middendorf* and its progeny without pointing to any evidence of the financial change in the value of C&G Distributing that could be attributable to Mark as an employee of the corporation.

2. *Mark's Interest in the SJG 2007 Trust*

{¶61} Bridget appears to acknowledge the primary obstacle in making her claim that this case is analogous to *Middendorf* is that the trial court determined the

2007 SJG Trust is *neither separate or marital, but belongs to a third party*. Bridget attempts to surmount this impediment on appeal by construing certain provisions of the Trust Agreement which defines the parameters of Mark's authority as Trustee and his capacity as primary beneficiary.

**{¶62}** Bridget specifically directs us to the testimony of her witness, Mr. Kordik, who found no significant distinction between Mark's fiduciary capacity as Trustee and Mark's capacity individually, stating that it made no difference that Mark only participated in the acquisition of Samuel's shares of C&G Distributing and the subsequent sale to Anheuser-Busch as Trustee of the SJG 2007 Trust. Kordik opined that Mark's capacity as Trustee and primary beneficiary as stated in the Trust "is tantamount to outright ownership." (Doc. No. 183 at 23). Mr. Kordik based his opinion upon the broad authority conferred to Mark as Trustee to distribute the accumulated income to himself for his health, support and maintenance.[18]

**{¶63}** In a making this argument, Bridget appears to advocate for the position that mere existence of provisions in a trust agreement naming a spouse as trustee

---

[18] We note that at oral argument, Bridget's counsel was asked to direct this Court's attention to the evidence in the record which supported her contention that Mark exceeded his authority as Trustee to distribute the accumulated income and invade the principal of the 2007 SJG Trust to make distributions to himself. Bridget's counsel generally referred to the report of Bridget's witness CPA David Fortney who traced $405,000 that was distributed to Mark's personal account during a six-year period and identified these funds as being "commingled." However, the "commingled" nature of the income distributions to Mark's personal account during the parties' marriage is irrelevant to the consideration of whether Mark exceeded his authority as Trustee and impermissibly invaded the Trust principal. Mark admitted that he wrote checks from the SJG 2007 Trust account to support Bridget and the children during the marriage. (*See* Doc. No. 182 at 48). Moreover, it is evident from the trial court's equitable award that all of Mark's income distributions from the SJG 2007 Trust were included in the property settlement in the divorce.

and primary beneficiary with certain discretionary powers as a matter of law brings the trust itself under the purview of R.C. 3105.171, as either a spouse's "outright ownership interest," or at the very least as an "interest" the spouse "currently has" under R.C. 3105.171(A)(3)(a)(ii), akin to a retirement benefit. Bridget maintains this to be true without regard to whether the trust is funded with a third party's property, whether the trust agreement placed certain requirements limiting a trustee/spouse's access to the principal in line with the third-party grantor's intent to provide for two or more generations, and without regard to whether a trustee/spouse has exceeded the authority granted under the parameters of the trust agreement.

{¶64} Bridget claims that at least one Ohio appellate court has addressed this issue and directs our attention to *Maloney v. Maloney*, 160 App.3d 209, 2005-Ohio-1368 (2d Dist.). In *Maloney*, Husband challenged the trial court's determination that Wife's interest in a trust was not marital property. Wife's father owned a self-storage company, where Wife was employed as a manager. Wife's parents established a limited partnership that owned the real estate the self-storage company leased and operated its business upon.

{¶65} During the marriage, a twenty-six percent share of the limited partnership was conveyed to Wife's father, as Trustee, for the benefit of Wife. The trial court characterized the conveyance as a gift and noted that Wife received the

income from the trust. Husband offered evidence that the value of the twenty-six percent stake in the limited partnership in the trust, from which Wife was entitled to the income, increased by $286,000 during the marriage and argued that the appreciation in the limited partnership shares was marital property because it was a product of Wife's work as a manager. On appeal, the appellate court addressed "whether the trust is marital property the court is charged by R.C. 3105.171 to divide." *Maloney*, 2005-Ohio-1368 at ¶ 55.

{¶66} Bridget specifically highlights the comments made by the appellate court in *Maloney* in setting the background for the discussion that "R.C. 3105.171(A)(3)(a) defines marital property in the broadest terms to include any property that either spouse currently owns or 'has' " to argue that the trial court erred as a matter of law in this case when it determined that the SJG 2007 Trust was neither separate or marital property, but that belonging to a third party. *Maloney*, 2005-Ohio-1368, ¶ 56. However, we note that the appellate court in *Maloney* never reached a conclusion on whether the trust corpus was marital property because the trustee was not joined as a party to the action under Civ. R. 75.

{¶67} Moreover, there are insufficient facts included in the *Maloney* case to draw a fair comparison to the instant case in order to say that the statements of the appellate court in *Maloney*, in *dicta*, regarding "any property that either spouse currently owns" or "has" in the context of determining the marital or separate

character of a spouse's interest in a trust is dispositive to the outcome here. Notwithstanding this fact, the appellate court in *Maloney* found, similar to the trial court in the instant matter, that Husband's mere assertion that Wife's efforts "have increased the value" of the limited partnership or the interest in it owned by the trust, was insufficient absent any evidence showing that the increase in the value of either was "due to" Wife's labor as a manager in any material respect. *Maloney*, 2005-Ohio-1368, ¶ 57.

{¶68} Bridget also directs us to several cases from other jurisdictions in support of her position that the trial court erred in concluding that the 2007 SJG Trust was not subject to equitable division under R.C. 3105.171. In reviewing these cases it becomes apparent that there is no uniform approach applied across jurisdictions on this issue. Rather, each case cited by Bridget employs a case-by-case analysis of the facts presented instead of applying a bright line rule based simply upon the provisions contained in the trust agreement.[19]

{¶69} As the Supreme Court of Vermont observed in *Chilkott*, a case cited by Bridget on appeal, a "review of opinions from other states on this question reveals there is no unanimity as to whether trial courts should consider or divide future interests in trusts in making a property division * * * [b]ecause characteristics

---

[19] Moreover, we note that the factual distinctions of the cases cited by Bridget in her brief from the facts of the instant case are readily apparent upon initial review. *See, e.g., In re Marriage of Romano*, 2012 IL App (2d) 091339, 968 NE.2d 115 (2012); *Caruso v. Caruso*, 71 Mass App.Ct 1105 (2008).

of trusts differ so greatly, case law turns 'on the attributes of the respective disputed interests' and construction of the enabling statute." *Chilkott*, 158 Vt. 195, 607 A.2d 883, fn, quoting *Lauricella v. Lauricella*, 409 Mass. 211, 214-15, 565 N.E.2d 436, 438 (1991) (stating that "no clear consensus" among states on the propriety of considering or dividing trusts in property distributions). As a result, we find the case-by-case approach based upon the intent and conduct of the relevant parties with regard to the formation and the operation of the trust to be the better approach and more consistent with the manifest weight standard of appellate review applied to a trial court's determination of marital and separate property pursuant to R.C. 3105.171(B). [20]

**{¶70}** In taking this approach, we note that other jurisdictions have generally taken a similar position as the trial court in this instance that a trust such as the 2007 SJG Trust, which is an irrevocable trust, is an independent third-party entity and that assets held by such a trust are not property owned by either spouse, but rather property owned by a third party, namely the trust itself and as such cannot be subject to equitable division in a divorce. *See e.g., McGinn v. McGinn*, 273 Ga. 292, 540 S.E.2d 604 (2001); *Findlen v. Findlen*, 695 A.2d 1216 (Me. 1997); *In re Marriage*

---

[20] *See, e.g., D.L. v. G.L.*, 61 Mass. App. Ct. 488, 496–97, 811 N.E.2d 1013, 1023 (2004) (stating that "while a judge is not necessarily precluded from including within the marital estate * * * a party's beneficial interest in a discretionary trust * * * because of the peculiar nature of such a trust, the trust instrument and other relevant evidence must be examined closely to determine whether that party's interest is too remote or speculative to be so included").

*of Jones*, 159 Or. App. 377, 981 P.2d 338 (1999); *Endrody v. Endrody*, 914 P.2d 1166 (Utah Ct. App. 1996).

**{¶71}** However, to be clear, in this instance Mark does have certain property interests flowing from the 2007 SJG Trust which are subject to R.C. 3105.171(A)(3). While the 2007 SJG Trust itself may not be subject to division, the distributed income received by Mark from the SJG 2007 Trust is a property interest held by Mark. Therefore, the trial court properly included the $330,000 of annual income distributions to Mark from the 2007 SJG Trust in its calculation of Mark's child support and spousal support obligations.

**{¶72}** Based on the foregoing, and in the particular circumstances of this case, we do not find that Bridget has demonstrated a compelling reason for us to determine that the trial court erred when it found that the SJG 2007 Trust was property of a third party, not marital property, and not subject to equitable division under R.C. 3105.171(A)(3). Accordingly, the first assignment of error is overruled.

*Second Assignment of Error*

**{¶73}** In her second assignment of error, Bridget argues that the trial court erred in applying the $150,000 combined income level cap when calculating Mark's child support obligation. Specifically, Bridget maintains that the trial court failed to consider evidence indicating that the children were accustomed to higher standard of living in excess of that afforded by the trial court in its child support calculation.

{¶74} "A trial court has considerable discretion related to the calculation of child support, and, absent an abuse of discretion, an appellate court will not disturb a child support order." *Clark v. Clark*, 3d Dist. Henry No. 7-15-09, 2015-Ohio-3818, ¶ 28, citing *Pauly v. Pauly*, 80 Ohio St.3d 386, 390 (1997). An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶75} "The level of support for a combined gross income of $150,000 is the starting point from which a trial court exercises its discretion in fashioning a child support award for parents with higher incomes." *Bajzer v. Bajzer*, 9th Dist. Summit No. 25635, 2012-Ohio-252, ¶ 5; R.C. 3119.04(B). If the parties have a combined income exceeding $150,000, the child support guidelines do not apply. *Phelps v. Saffian*, 8th Dist. Cuyahoga No. 103549, 2016-Ohio-5514, ¶ 9. Instead, R.C. 3119.04(B) states that if the combined income of the parties exceeds $150,000, the court must establish the amount of child support on a case-by-case basis, taking into consideration "the needs and the standard of living of the children who are the subject of the child support order and of the parents." R.C. 3119.04(B). Trial courts need not consider the deviation factors set forth in R.C. 3119.23 and 3119.24 when setting support amounts higher than the statutory amount for a combined gross income of $150,000 since "[s]upport awards in excess of that minimum * * * are

anticipated by R.C. 3119.04(B) and are not deviations." *Wuscher v. Wuscher*, 9th Dist. Summit No. 27697, 2015-Ohio-5377, ¶ 27. For purposes of R.C. 3119.04(B), the "needs" of a child are the same as they were at common law: food, clothing, shelter, medical care, and education. *Phelps*, 2016-Ohio-5514 at ¶ 9.

**{¶76}** Under R.C. 3119.04(B), "domestic relations courts have more discretion in computing child support when the parents' combined income is greater than $150,000 annually." *Macfarlane v. Macfarlane*, 8th Dist. Cuyahoga No. 93012, 2009-Ohio-6647, ¶ 17. This statute "neither contains nor references any factors to guide the court's determination in setting the amount of child support; instead, the court must determine child support on a case-by-case basis." *Siebert v. Tavarez*, 8th Dist. Cuyahoga No. 88310, 2007-Ohio-2643, ¶ 31. Thus, R.C. 3119.04(B) "leaves the determination entirely to the court's discretion, unless the court awards less than the amount of child support listed for combined incomes of $150,000." *Cyr v. Cyr*, 8th Dist. Cuyahoga No. 84255, 2005-Ohio-504, ¶ 54, citing R.C. 3119.04(B).

**{¶77}** It is undisputed in this instance that the parties' combined incomes are in excess of $150,000 annually. The trial court made the following findings in its March 10, 2016 decision, which were incorporated into the parties' final divorce decree.

> **Immediately before the termination of this marriage the parties
> had a very lucrative standard of living as there were discussions**

> **about buying additional homes, or remodeling homes and buying some new automobiles, all of the same was a result of the distribution of the Trust fund containing the proceeds of the sale of the C&G Distributing stock.  Prior to that time, the parties had a good standard of living, merely as a result of the income received by Mark from his work * * * at C&G Distributing, Inc**.

(Doc. No. 153 at 13).

> **This Court cannot find there has been any establishment that the needs and standard of living of the children are in excess of the child support schedule and this Court consequently cannot find that it would be unjust or inappropriate and not in the best interest of the children to order the [child support] amount at the $150,000.00 level.**

(Doc. No. 153 at 15).

{¶78} At the outset we note that the trial court's observation regarding the change of the parties' standard of living from a "good" to a "very lucrative" lifestyle *immediately prior* to Bridget filing for divorce is supported by the record.  However, in addition to applying the $150,000.00 combined income level cap and ordering Mark to pay an annual child support obligation of $24,532, the trial court also ordered Mark to continue to pay the cost of the three children to attend private school and the cost of the children's health insurance. *See Roberts v. Roberts*, 12th Dist. Butler Nos. CA2004-04-081, CA2004-04-087, 2005-Ohio-2792, ¶ 21 (stating that "[p]rivate school tuition is a form of child support"); *see also*, *Pearlstein v. Pearlstein*, 11th Dist. Geauga No.2008-G-2837, 2009-Ohio-2191, ¶ 66-67 (concluding the trial court did not abuse its discretion when, in lieu of an upward

-42-

deviation from the $150,000 cap on the child support guidelines, the court ordered father to pay 100 percent of the children's uncovered medical expenses, private school tuition, and expenses for the extracurricular activities in addition to the father's child support obligation).

{¶79} Moreover, the record establishes that the children each had sizable 529 plans,[21] life insurance policies, and custodial accounts, which the parties agreed to retain for the children's benefit without credit or accommodation. There is no indication from the record that in assessing the needs and the standard of living of the children and of the parents in this case that the trial court overlooked or failed to accord appropriate weight to certain evidence as Bridget now maintains on appeal.

{¶80} The dissent would find that the trial court abused its discretion in failing to calculate Mark's child support at a higher amount based upon the dissent's contention that Mark *will* receive *at least* $330,000 in annual income from the 2007 SJG Trust in perpetuity. However, the record establishes that the trial court only used the $330,000 amount to impute income to Mark for purposes of calculating his child support and spousal support based upon its determination that this figure

---

[21] "529 Plans, also known as 529 College Savings Accounts, are so named because they are permitted under Section 529 of the Internal Revenue Code, 26 U.S.C. 529." *Wolf-Sabatino v. Sabatino*, 10th Dist. Franklin No. 12AP–1042, 2014-Ohio-1252, ¶ 49. *See also Albers v. Albers*, 2d Dist. No.2012 CA 41, 2013-Ohio-2352, fn. 4.

represented a fair approximation of the annual income distributed to Mark from the 2007 SGJ Trust after he no longer received a salary, either as an employee of C&G Distributing or as a consultant for Anheuser-Busch.  Notably, the trial court retained jurisdiction to modify both support amounts.

{¶81} As previously discussed in detail the Trust Agreement provides Mark with a right to withdraw the accumulated income subject to the discretion of the Trustee and so long as the distribution meets a defined ascertainable standard—i.e., the distribution must be appropriate to support, maintain or provide for the health and education of the beneficiaries, which will vary from year to year.  In addition, in the event Mark becomes unable or unwilling to serve as Trustee, a successor trustee shall be designated.  In other words, there is no guarantee that Mark will remain the Trustee throughout his life.  The record further establishes that the lion's share of the 2007 SGJ Trust principal has been invested in market based accounts.  Each of these variables affect not only amount of income distributed to Mark, and the other beneficiaries, on a yearly basis, but also the amount of income accumulated by the Trust itself.

{¶82} Accordingly, we find no abuse of the trial court's discretion in applying the $150,000 combined income level cap on the guidelines to Mark's child support obligation.  The second assignment of error is therefore overruled.

*Third Assignment of Error*

**{¶83}** In her third assignment of error, Bridget claims that the trial court's distributive award to her in the amount of $300,000 for Mark's financial misconduct was unreasonable and argues that her compensation should be larger.

Section 3105.171(E) of the Revised Code states as follows:

> **(4) If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property.**

> **(5) If a spouse has substantially and willfully failed to disclose marital property, separate property, or other assets, debts, income, or expenses as required under division (E)(3) of this section, the court may compensate the offended spouse with a distributive award or with a greater award of marital property not to exceed three times the value of the marital property, separate property, or other assets, debts, income, or expenses that are not disclosed by the other spouse.**

**{¶84}** While a trial court enjoys broad discretion in deciding whether to compensate one spouse for the financial misconduct of the other, the initial finding of financial misconduct must be supported by the manifest weight of the evidence. *Davis v. Davis*, 11th Dist. Geauga No. 2011-G-3018, 2013-Ohio-211, ¶ 77. Once financial misconduct is established, the decision to make a compensating distributive award rests within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Epperson v. Epperson*, 6th Dist. Wood No. WD-03-1195, 2015-Ohio-2443, ¶ 41.

{¶85} Here, there is no assignment of error relating to the trial court's finding of Mark's financial misconduct. Rather, Bridget simply quarrels with the amount of the distributive award ordered by the trial court. Accordingly, we shall review the trial court's decision for an abuse of discretion. An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶86} The trial court made the following findings relative to its determination that Mark committed financial misconduct during the trial court proceedings:

> **Throughout the proceedings Mark had failed to timely disclose information with respect to the assets in this case and there was a large amount of responses he had given in response to interrogatories and requests for discovery that was either incomplete, inaccurate or quite frankly false.**
>
> **A great deal of the delay in this case coming to trial was a result of Mark's inability and failure to present accurate and complete information.**
>
> **This resulted in the Court having additional hearings with respect to the failure of Mark to comply with the requests for discovery and to make full disclosure.**
>
> **As indicated by counsel the record is replete with inaccurate responses to discovery and one of the most notable failures to disclose was regarding a million dollars that was in an account which was not disclosed by Mark Guagenti until a late date being some of the final depositions in this matter.**

> **As a result, this Court finds Mark has engaged in financial misconduct under both [R.C.] 3105.171(E)(4) and (5).**
>
> **Under subsection (4) referred to the Court has the ability to make a distributive award between the parties and under [subsection] (5) the Court [may] make a distributive award not to exceed three times the value of the marital property, or other assets not disclosed.**
>
> **While the Court recognizes the million dollar account we were talking about was ultimately found to be a separate asset of the SJG Trust, the disclosure was still germane to the process of this divorce case and the full disclosure of all possible assets that may be subject to division. [22]**
>
> **Irrespective of this, the Court further would note that under subsection (4) of the aforementioned code section, Mark has received [a] distribution of assets of $507,683.00 and was ordered to pay Bridget an amount to equalize the distribution of assets.**
>
> **Based upon Mark's failure to disclose assets and continual usurpation of the discovery process in this case and his flagrant refusal to comply, it is appropriate for a distributive award to be made wherein Mark shall pay Bridget Guagenti, in addition, to the amount of $179,363.56 to equalize the property distribution hereinbefore referred to, the amount of $300,000.00 to be paid within seven (7) days after the filing of the Judgment Entry Decree of Divorce in this case.**

(Doc. No. 153 at 15-16).

{¶87} As previously indicated, Bridget's primary contention on appeal with respect to this assignment of error is her claim that the trial court should have given

---

[22] It appears that the trial court is referring the $1,000,000 belonging to the SJG 2007 Trust, which was held in escrow by Anheuser-Busch under the terms of the June 13, 2013 asset purchase agreement. The record reflects that in fact $3,000,000 was held in an escrow account under the name C&G Distributing, with a million dollars belonging to each of the shareholders who were the three trusts previously discussed in the narration of the facts.

her a higher distributive award for Mark's financial misconduct. As acknowledged by the trial court, Mark was not forthcoming in disclosing information about certain assets during discovery, which frustrated the legal process and unnecessarily extended the trial court's resolution of this case. However, in addition to the $300,000 distributive award compensating her for Mark's financial misconduct, the trial court also awarded Bridget over $127,000 in attorney fees, which included the fees Bridget incurred while pursuing motions for orders to compel Mark to comply with discovery requests and to hold him in contempt for violating the restraining order when he purchased a condo and a luxury vehicle during the divorce proceedings. It should be noted that the record establishes that Mark purchased these items with funds that he was entitled to from the SJG 2007 Trust, and without invading the principal of the trust. The trial court nevertheless sanctioned Mark for violating the protection order as his misconduct was pervasive throughout the case and hampered the parties' efforts to assess an accurate summation of marital property subject to division.

{¶88} Bridget specifically claims the trial court's distributive award for Mark's financial misconduct was unreasonably low in light of the high value of assets Mark failed to timely disclose. However, as discussed in the first assignment of error, most of these high value, yet undisclosed assets, were determined by the trial court to be neither marital nor separate property, but the assets belonging to a

third party and therefore not subject to division. Based on the foregoing, we find no abuse of discretion in the trial court's decision to award Bridget $300,000, in addition to over $127,000.00 in attorney fees, for Mark's misconduct during the trial court proceedings. The third assignment of error is therefore overruled.

**{¶89}** Having found no prejudicial error to Bridget in the assignments of error raised herein and overruling the same, the judgment of the Allen County Court of Common Pleas, Domestic Relations Division, is affirmed.

*Judgment Affirmed*

**PRESTON, P.J., concurs.**

**/jlr**

**ZIMMERMAN, J., concurs in part and dissents in part.**

**{¶90}** While I agree with the majority that the SJG 2007 Trust is neither marital nor separate property, I disagree with the trial court's failure to award spousal and child support using, at a minimum, the sum of $330,000.

**{¶91}** The trial court determined, and the majority overlooked, that the SJG 2007 Trust generated a "substantial" income for Mark every year. Specifically, the trial court found that "… the principal [sic] still exists in that regard and the Court would indicate the income from the assets in total *has been substantial and will be substantial* in the future". (Emphasis added). (Doc. 16 Pg. 13). This being the case,

the trial court found $330,000 to be the past substantial figure, even though the trust corpus has increased several times fold upon the Trusts' sale of stock to Anheuser-Busch in 2014.

**{¶92}** Thus, Mark continues to have access to the trust income, at its increased value, which he can receive without oversight by the Trusts' protective committee.

**{¶93}** Using basic math, Bridget's annual income to raise her family of 4 is just shy of $85,000 ($60,000 in alimony and approximately $25,000 in child support) while Mark's income, at a minimum, is $245,000 ($330,000 - $85,000) to support a family of 1.

**{¶94}** I would reverse on the issue of child support.