**[Cite as *Saari v. Fieweger*, 2026-Ohio-1593.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Beth Saari

      Appellant/Cross-appellee

v.

Joshua Fieweger

      Appellee/Cross-appellant

Court of Appeals No.    {48}L-25-00084
                      {48}L-25-00093

Trial Court No.  DR0202000462

**<u>DECISION AND JUDGMENT</u>**

Decided: May 1, 2026

* * * * *

Craig M. Witherell and Maria Spasovska, for appellant/cross-appellee.

Michael E. Bryant, for appellee/cross-appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant/cross-appellee, Beth Saari, and appellee/cross-appellant, Joshua Fieweger, appeal the judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, which granted the parties a divorce and divided the parties' assets and debts. For the reasons that follow, the trial court's judgment is affirmed, in part, and reversed, in part and the matter is remanded for the court to clarify the parties' distributive awards and its valuation of the newly vested stock and options.

## I. Facts and Procedural History

{¶ 2} Saari and Fieweger married on June 17, 2017. No children were born of the marriage. On July 31, 2020, Saari filed a complaint for divorce; Fieweger answered the complaint and filed a counterclaim for divorce.

{¶ 3} On September 9, 2020, the magistrate ordered that Fieweger pay Saari temporary spousal support in the sum of $3,500 per month, retroactive to August 20, based on its calculation of Fieweger's annual gross income at approximately $1 million and Saari's at $0. Saari filed a written request for an evidentiary hearing to modify the magistrate's order. The parties both disputed the income, or lack thereof, and expenses attributed to each party.

{¶ 4} On February 26, 2021, the court awarded Saari $6,228 monthly in temporary spousal support, effective September 9, 2020, which included tuition costs explaining that the sum would ultimately benefit Fieweger by increasing Saari's employability. The court did not modify the calculation of Fieweger's gross income

{¶ 5} On February 1, 2022, the court ruled on several pretrial motions granting Saari's motion for interim attorney fees in the amount of $9,500 and denying her motion to escrow Fieweger's annual bonus. The court granted Fieweger's motion for a vocational assessment of Saari.

{¶ 6} Following extensive discovery, motion practice, and Saari's two counsel changes, on June 15, 2022, the matter proceeded to a four-day trial. The parties presented the following relevant testimony which incorporated volumes of evidentiary

2.

documents. Saari's stock valuation expert, Gregory Light, testified that he reviewed a Welltower corporate stock valuation analysis prepared by Fieweger. The analysis included various types of stock included in Fieweger's compensation: vested and unvested stock, stock options, and stock and options able to be earned under Welltower performance metrics. Light also reviewed Fidelity investment account statements that formed the basis of Fieweger's analysis.

{¶ 7} Light stated that the analysis was largely accurate excepting the stock options. He explained that Fieweger used the current, or intrinsic value (the exercise or strike price which was below market value) and did not consider the added value or value potential above and beyond the intrinsic value. Light used the Black Scholes stock options' valuation method which "captures both the intrinsic value and the value over and above" the intrinsic value.

{¶ 8} Using this method, Light calculated the performance-based options at $19.09 per share versus Fieweger's intrinsic, value-only amount of $2.33. The time-based vesting options were valued at $23.79, versus $18.60. He set the gross fully vested potential maximum value for the performance options at $375,958, and the time options at $97,515 (both values are pre-tax and assuming the entire value is attributable to the marriage). Light acknowledged that future changes in the value of the stock prices would alter their value.

{¶ 9} Counsel questioned Light regarding an October 12, 2021 Computershare document representing its holding, as a stock transfer agent, of 894 shares of Fieweger's

3.

Welltower stock with a value of $83.29 per share or $74,461.26. On December 31, 2021, the closing price of the stock was $85.77, or a total of $76,678. Light did not see any indication in the October, November, or December 2021 Fidelity statements of the shares being transferred to the Fidelity account.

{¶ 10} Light agreed on cross-examination that the October-December 2021, Fidelity investment statements list a grant date of February 16, 2021 for unvested stock Grant Id. 2021PRSU, in the amount of 894 shares. Light acknowledged the possibility that Computershare holds the stocks but that they could also appear on the Fidelity statements. He also questioned why the Fidelity statements only listed 894 shares of unvested stock and not the entire 2,193 shares of restricted stock.

{¶ 11} Light conceded that in the unlikely event that Welltower went bankrupt, all the stocks and options he valued could potentially have no value. He also agreed that Fieweger's analysis was fair and forthright.

{¶ 12} Saari has a master's degree in accounting and testified that her last employment ended in 2016, after her position was eliminated. Her yearly salary was approximately $35,000 to $40,000. Saari stated that during the marriage Fieweger wanted her to stay home and run the household. She is currently unable to work in accounting due to an eye condition causing blurry vision. Saari testified that to become employed she needs additional training and listed $1,200 in monthly tuition on her expense schedule. She agreed that she has not yet returned to school, blaming it on debt

4.

and a knee surgery. She removed the tuition expenses from the schedule filed the week prior to trial.

{¶ 13} Saari stated that her total monthly expenses for her and her three children is $14,000, and she is requesting a spousal support order. Saari testified regarding three bank accounts, each in her name and the name of one child. She stated the accounts were mainly funded from child support payments transferred from the same account. In November 2017, Saari's "child support account" had an ending balance of $95,000. In December 2017, the account value increased from $95,000 to $184,412.94, with a transfer from the parties' joint account. She indicated that she transferred $33,500 into each child's account; she requested these amounts be considered separate property. On May 20, 2020, three separate $60,000 deposits were transferred from a money market account into each account; Saari believed Fieweger authorized the transfers to help save for her children's college. She then clarified that at the time she transferred the $180,000, she had discussed filing for divorce and that Fieweger threatened her stating that "he was going to take their child support and their college money and everything if I did." Saari admitted that she did not list the children's accounts on her schedule of assets following "advice of counsel" but denied any attempt to hide the assets. Saari agreed that her former counsel filed a motion to quash the subpoena or to grant a protective order regarding the account information.

5.

{¶ 14} Saari testified regarding a 401(k) set up in 2015 or 2016 through her former employer and prior to the marriage. The statements beginning June 2017 through December 31, 2021 were admitted into evidence. The first statement had an account balance of $151,072.86, and a loan balance of $9,282. The December 2021 statement reflects a zero-loan balance. Saari stated that she repaid the loan from a bank account solely in her name though it did contain marital funds.

{¶ 15} Saari purchased her 2018 Chevrolet Suburban for $57,200, using $13,000 from her trade in of a premarital vehicle and marital funds paying the balance. As to the parties' home, Saari stated that she and her first husband purchased it in 2005, and she received it in the divorce. During the marriage, the parties paid the remining $30,000 mortgage balance.

{¶ 16} Saari testified that during the marriage she incurred medical bills relating to both knees, including from a 2021 knee surgery. Saari stated that her mother loaned her $30,000. Saari requested that she be awarded a portion of her attorney fees.

{¶ 17} Regarding the Fidelity accounts, Saari requested that the marital portion of the money market account and vested stock be equally divided. She claimed that Fieweger informed her that certain unvested stock and options granted in 2022, were for past performance and were subject to division. Saari admitted her calculations as an exhibit. Following an objection as to the basis of her conclusions, the parties ultimately stipulated that if the court found that any of the claimed shares were marital property they would be placed in a constructive trust for future valuation and division.

6.

{¶ 18} In 2020, Saari used Fieweger's Health Savings Account (HSA) for her daughter's braces. Saari stated that they had agreed that she would reimburse him but that after her spousal support increase angered Fieweger, he reported that she fraudulently accessed the account. The magistrate subsequently ordered that Saari have access to the account during the pending divorce proceedings. In December 2021, Fieweger eventually gave her access, but at that point all the money for the year had been spent.

{¶ 19} On cross-examination, counsel questioned Saari about the $1,250 she listed as monthly tuition expenses. Saari stated that the increased spousal support award reflecting the tuition did not start until June 2021, but that due to prior debt, including medical bills, she had not been able to enroll. Saari acknowledged that she received a retroactive, lump sum payment.

{¶ 20} Turning to her children's three bank accounts, counsel questioned Saari about why the accounts were not included in the schedules when she was the primary holder and that approximately one month prior, she transferred $181,000 from an account in her name and divided the sum up into the three accounts. Saari explained that counsel did not advise her to include them.

{¶ 21} Counsel posed additional questions regarding the source of the funds. Saari stated that she and Fieweger agreed to fund a money market account for her children's college but once she mentioned filing for divorce, he said he was taking the money back. She acknowledged that from November 2017 to November 2019, she did

7.

not transfer any money out of what was characterized as her child support account (though there were other funds going in and out), maintained in her name, but that in November 2019, she made three, $17,000 withdrawals and put them in her children's accounts. She then made three, $60,000 transfers and other small transfers. Saari stated that she still maintains the account and that the money that goes into the account winds up in her children's accounts. Saari explained that the transfers began once spousal support payments were being deposited into the account; she wanted to keep the amounts separate. She was also concerned that Fieweger would take the children's money.

{¶ 22} Saari agreed that she did not spend the $1,200 per month she received in child support and that Fieweger monetarily supported her children. Saari used the remaining $1,000 of the 2021 HSA to pay some of her medical bills. She supported her family with her spousal support "and other things," including a $30,000 loan from her mother. She agreed that her expenses schedule indicates that she is spending roughly double her spousal support payments.

{¶ 23} Fieweger testified that he left the marital home on November 8 or 9, 2019. He agreed that on November 15, he removed $86,000 from their joint accounts. Fieweger stated that during the marriage Saari transferred a lot of cash out of the joint accounts and he wanted to make sure he had enough money for living expenses and to set up a separate residence. He added some money back to the account to cover the joint credit card debt.

8.

{¶ 24} Fieweger testified that he reimbursed Saari an agreed-upon $1,500 for her child's braces later realizing that she used $1,500 from his HSA account. In 2022, Saari used $1,000 from the HSA for medical bills related to her 2021 knee surgery. Fieweger acknowledged that Saari owned the marital residence with a mortgage that they refinanced into a home equity line of credit.

{¶ 25} Fieweger, a CPA, conducted an accounting of his Welltower 401(k), dividing the contributions and income into premarital and marital assets. He stated that $379,000 would be considered premarital. Saari's share of the marital value was $131,000.

{¶ 26} Fieweger testified regarding Welltower's Long-Term Incentive Plan (LTIP), which provides for all the time and performance-based stock and stock options awards. Relevant here were four, three-year grant cycles: 2016-2018, 2019-2021, 2020-2022, and 2021-2023. The over-arching purpose of Welltower's LTIP is to foster long-term growth and profitability "by providing officers, key employees and non-employee directors of the Company with incentives to achieve long-term corporate objectives."

{¶ 27} Fieweger stated that the performance options set forth in the 2021 Special Stock Option Award Agreement, effective December 13, 2021, require the participant's continued employment and the company's "achieving or exceeding a 10.5 % compound annual growth rate[.]" The options had vesting dates of February 1, 2025, December 13, 2025, and December 13, 2026. The performance period included January 1, 2022

through December 31, 2024. Fieweger stated that the unvested performance options were not marital as they were neither earned nor vested during the marriage.

{¶ 28} A Fidelity money market account had a December 31, 2021 value of $117,914. Fieweger determined the marital portion of the account using the marriage dates of June 14, 2017 through December 31, 2021. The nonmarital portion totaled $20,587, and included stock granted and vested prior to the marriage. The marital portion totaled $97,326, with Saari entitled to half.

{¶ 29} Fieweger conducted an analysis of the Welltower vested stock as of December 31, 2021. He set the marital value at $430,741, and nonmarital value at $150,350.

{¶ 30} As to the time-based stock options, the vesting dates were one-fourth on January 15, 2022, January 15, 2023, January 15, 2024, and January 15, 2025. Fieweger valued the after-tax value of the marital portion of the unvested stock options at $19,762, representing the "intrinsic" value. Fieweger acknowledged Saari's expert's use of the Black Scholes valuation method but stated that ultimate value was not his chief consideration based on the constructive trust proposal. The units were his main concern as the value fluctuates.

{¶ 31} Fieweger testified that he has no shares of value with Computershare. His employer used Computershare as its brokerage agency for employee issued stock. Within days of marrying Saari, the company switched everything over to Fidelity.

10.

Fieweger testified regarding a document purportedly showing that the shares were transferred out of the Computershare account on August 15, 2017.

{¶ 32} Fieweger explained that his Fidelity investment account showed a February 16, 2021 grant (identification number 2021PRSU) of 894 shares; the same grant date and number of shares reflected on the Computershare transaction document. He again stated that Computershare, as a recordkeeper and share transfer agent, never held the shares— they were continuously held by Fidelity.

{¶ 33} Fieweger testified regarding various joint and separate bank accounts maintained by the parties. He traced an April 26, 2017, $71,000 deposit into a joint account to a $45,000 check and the closing of another joint checking account. A May 5, 19,000 deposit came from a separate checking account. He believed the sums to be separate, premarital property but acknowledged that the remaining $26,000 came from a joint account and was marital.

{¶ 34} Fieweger requested a recovery of a portion of his attorney fees based on his belief that Saari concealed assets and inflated expenses on the court schedules. He further claimed that her twice retaining new attorneys prolonged the proceedings and increased his attorney fees.

{¶ 35} During cross-examination, Fieweger agreed that his 2021 annual incentive bonus was paid on February 18, 2022. Counsel questioned him about various restricted stock shares and options that vested after the December 31, 2021 valuation date.

11.

Fieweger agreed that, depending on the vesting date, the shares either were or should be prorated and assigned a marital value.

{¶ 36} Counsel extensively questioned Fieweger about the LTIP's qualifying conditions for participating in the various stock and stock options programs including continued employment or certain qualified or good cause terminations and the noncompete agreement.

{¶ 37} As to the time-based, restricted stock which vested on January 15, 2022, subsequent to the December 31, 2021 valuation, Fieweger agreed they would no longer need to be held in a constructive trust. Regarding the unvested performance stocks, Fieweger acknowledged that the parties, including Saari's expert, discussed the performance metric to be used to arrive at their value. Based on the conversation, the expert applied the 200 per cent performance number. Fieweger stated that there was a misunderstanding about which percentage applied to which grant but that at this juncture, because they are unvested and held in a constructive trust, the performance metrics are not currently relevant.

{¶ 38} Counsel questioned Fieweger regarding an exhibit Saari prepared showing various shares and options granted in 2022. Specifically, the restricted stock shares granted on January 17, 2022, with a December 31, 2025 vest date under the Outerperformance Program Award Agreement (OPP). He agreed that the award contemplates past and future performance.

12.

{¶ 39} Fieweger has been employed at Welltower since 2011, and in 2021 he had a $404,023.08 base salary with a $451,397 bonus. During the marriage, he deposited $4,000 of marital funds into each of his two children's 529 plans. He agreed that the home equity line taken out on the marital residence was used, in part, to pay the loan balance on Saari's Chevy Tahoe.

{¶ 40} On January 2, 2025,[1] the court filed its decision issuing findings of fact and conclusions of law. It stated that its February 22, 2022 order set the equitable duration of the parties' marriage as June 14, 2017 through December 31, 2021, and neither party objected. Marital assets were valued using these dates.

{¶ 41} The parties agreed to value Fieweger's money market account at $117,914.59, with $97,326.68 as marital property. The court then divided the various stocks. The 6,775 share of fully vested stock were valued on December 31, 2021 at $581,091.75; 5,021 shares were considered marital and valued at $430,741.

{¶ 42} In a chart of Fieweger's stocks and stock options, the court listed 1,939 shares vesting after the December 2021 valuation date, but prior to trial. Later, the court concluded that 3,693 stock options vesting after the December 2021 valuation date, but prior to trial, were marital property and assigned them a value of $316,748 (3,693 shares at $85.77 per share).

---

[1]The domestic relations judge assigned to the case retired the day he filed the decision. The judge's successor presided over the balance of the proceedings.

13.

{¶ 43} Determining whether the unvested stock and stock options were marital or separate property, the court considered whether they were earned based on past, present, or future performance. Based on the LTIP language, the court concluded that the unvested stock units were based on present and future performance and are "intended to compensate performance during the vesting period and may include future service through the non-compete agreement."

{¶ 44} Noting that courts often treat unvested stock like retirement benefits, the court ordered that "Colleen Dooley be appointed to compute a coverture fraction for each stock option similar to the fraction used to divide retirement benefits." The assets would then be placed in a constructive trust.

{¶ 45} The court found credible Saari's expert's testimony regarding the Computershare account and value. The court concluded that the shares were marital property with a value of $76,678.38. The court determined that Fieweger's 2021 bonus of $451,397 was marital property to be divided.

{¶ 46} The court concluded that Fieweger was entitled to half of the $30,124 mortgage payoff of Saari's home which was made during the marriage with marital funds. Saari was entitled to half of the $261,496.07 marital portion of Fieweger's 401(k).

{¶ 47} The parties were awarded the bank accounts in their own names and their personal vehicles, with Saari owing $15,303, representing Fieweger's portion of the marital equity in her vehicle.

14.

{¶ 48} The court valued Saari's separate property at $718,798 and Fieweger's at $599,724. The court then valued the marital property at $1,948,924. The court stated that "[t]o equalize this amount, the court can order transfer of marital assts or separate property." The court then concluded that because the court already awarded Saari $325,165 of marital property she was entitled to $649,299. The court then divided this sum in half awarding Saari $324,649.

{¶ 49} Addressing Fieweger's claim that Saari engaged in financial misconduct, the court agreed that she knowingly used the HSA account and sought and received reimbursement of the same amount; the court ordered Saari to repay $1,334.11. Next, as to the monies Saari transferred to her children's accounts the court found her explanation not credible and stated that the accounts were marital property. Finally, the court ordered Saari to reimburse Fieweger $41,250 for the unused tuition costs. The court denied Fieweger's treble damages claim.

{¶ 50} The court denied Saari's request for spousal support and terminated Fieweger's temporary support order as of the date of trial. The court ordered the parties to pay their respective attorney fees.

{¶ 51} On January 16, 2025, Saari filed a Civ.R 60(A) motion requesting that the court correct various clerical errors in its decision. Saari claimed that the errors were not substantive and that many involve internal discrepancies. The errors included: (1) a discrepancy in the value of the marital, vested stock with the decision indicating it was $430,741.03, and the attached chart listing it as $430,651 (Saari agreed that the latter was

15.

the correct value); (2) conflicts in the marital value of Saari's vehicle with the decision setting the value at $30,606 and the chart $26,102 (Saari acknowledged that the higher amount was correct); (3) the decision correctly listed the Computershare stock as a marital asset valued at $76,678.38, but later was incorrectly listed as property awarded to Saari rather than Fieweger; (4) the 3,693 shares of stock, valued at $316,748.61, that vested after December 31, 2021, but prior to trial and determined to be marital property was omitted from the total value of the marital estate; (5) Fieweger's 2021 bonus with a post-tax value of $242,219, received in 2022, and determined to be marital property was excluded from the list of property awarded to Fieweger; (6) error in calculating the value of marital assets awarded to Fieweger (the court listed the amount as $1,096,531, when the correct value was $1,381,531); (7) recalculating Saari's marital property settlement to equally divide the marital assets (Saari claimed that the court erroneously halved her entitlement resulting in an award of one-fourth of the marital assets); and (8) error in the number of months (33) used in the court's calculation for reimbursement of Saari's tuition expenses.

{¶ 52} Fieweger opposed the motion to the extent that any of the claimed errors were in fact requests for substantive changes. He objected to the claim of error in awarding Saari any stock held through Computershare. Fieweger also objected to the repayment of medical expenses and the 60-day deadline for payment of the property settlement.

16.

{¶ 53} Fieweger claimed error in the court's addition of the full marital value of the Welltower 401(k) to Fieweger stating that the court's intent was that the marital portion of the retirement benefit be split through a Qualified Domestic Relations Order. He further noted that two bank accounts (with a combined value of approximately $9) were listed under the property to be awarded to Saari and Fieweger; he surmised that because they were in Saari's name they should have been awarded to her and that the correct combined value was $10.02.

{¶ 54} On March 27, 2025, and without specifically ruling on the Civ.R. 60(A) motion, the court entered its final judgment entry of divorce. The court first determined that the marriage spanned June 17, 2017, through June 21, 2022, the date of the final hearing. The court ordered that neither party be obligated to pay spousal support and that Fieweger's obligation terminated on June 21, 2022. To equalize the distribution of marital property, the court ordered Fieweger to pay Saari $367,000. The court divided the parties' assets as follows:

> Husband is awarded the following assets in their entirety, including all marital and non-marital portions, free from any claim by Wife:
>
> 1. Husband's money market account held by Fidelity Investments.
>
> 2. Husband's Welltower stock that was vested as of December 31, 2021.
>
> 3. Husband's Welltower stock that vested after December 31, 2021.
>
> 4. Husband's Welltower stock held by Computershare.
>
> 5. Husband's work bonus from Welltower received by him in 2022.

17.

6. Husband's Welltower 401(k) account.

7. Husband's bank accounts in his own name, including any custodial accounts for his children, or any accounts jointly held by Husband and his children.

Any marital interest that Wife has in the above listed assets has been taken into consideration in the court's determination of a distributive award to be paid by Husband to Wife.

. . .

Wife is awarded the following assets in their entirety, including all marital and non-marital portions, free from any claim by Husband:

1. The home and property at 2912 Lexington Glen Blvd., Monclova Township, Ohio.

2. Wife's 410(k)[sic] account with the Andersons.

3. Wife's 2018 Chevrolet Suburban, of which Husband has a partial marital interest.

4. Wife's bank accounts in her own name, including any custodial accounts for her children, or any accounts jointly held by her and her children.

Any marital interest that Husband has in the above listed assets has been taken into consideration in the court's determination of a distributive award to be paid by Husband to Wife.

The court divided the Welltower unvested stock and stock options as follows:

Husband shall retain all marital shares of Welltower stock vesting after December 31, 2021, with the exception of certain unvested stock/stock options/grants referenced below.

For the purposes of dividing Husband's unvested Welltower stock/stock option/grants, the parties shall retain Colleen Dooley to compute a marital fraction for each unvested stock/stock option/grant similar to the fraction used to divide retirement benefits, with the result of such fraction to reflect the number of marital and separate shares of stock/stock options/grants.

18.

Said stock/stock option/grants shall be held in the constructive trust proposed by Wife, attached hereto and incorporated herein, which both parties shall sign, with each party to receive one-half of the value of all marital stock/stock options/grants held in said constructive trust to the extent the same becomes vested. Husband shall retain all stock/stock options/ grants calculated as separate property. The parties shall each be responsible for one-half of Colleen Dooley's services.

{¶ 55} The court ordered Fieweger to pay $1,285.92 representing his portion of Saari's medical bills to be reflected in the distributive award. The court ordered Saari to repay $26,250 in spousal support that she failed to use for tuition and $1,334.11 for wrongfully using Fieweger's HSA. The sums were deducted from the distributive award. The court ordered that the parties pay their respective attorney fees and expenses.

## II. Assignments of Error

{¶ 56} On appeal, Saari raises three assignments of error for review:

I. The court abused its discretion in determining appellant's distributive award to equalize marital assets.

II. The trial court abused its discretion by retroactively terminating and modifying temporary spousal support absent a motion requesting the same, contrary to Civil Rule 75(N) and local court rules, and violating appellant's constitutional due process rights.

III. The trial court improperly classified grants of stock and stock options as separate property despite being earned for past and present employment during the marriage.

{¶ 57} Fieweger's cross-appeal includes the following eight assignments of error:

1. The court abused its discretion by finding that the date of the termination of marriage is June 21, 2022, which is the date of the final hearing.

2. The trial court abused its discretion by not terminating all temporary orders effective December 31, 2021.

3. The trial court's valuation and division of the "newly vested" stocks is against the manifest weight of the evidence and constitutes an abuse of discretion.

4. The trial court abused its discretion in ordering Colleen Dooley to calculate the marital share of the unvested stocks.

5. The court abused its discretion in issuing a judgment entry inconsistent with its own findings of facts and conclusions of law.

6. The trial court abused its discretion in finding that there was marital value in a Computershare account; this finding is also against the manifest weight of the evidence.

7. The trial court abused its discretion in awarding appellant a portion of custodial accounts as separate property.

8. The trial court erred in not awarding treble damages based on appellant's financial misconduct.

### III. Analysis

### A. Standard of Review

{¶ 58} Unless otherwise indicated, the parties' assignments of error are subject to an abuse of discretion standard of review. *Halbeisen v. Fantozz*, 2023-Ohio-4340, ¶ 7 (6th Dist.), citing *Gonzalez v. Gonzalez*, 2003-Ohio-5187 ¶ 19 (6th Dist.). A court abuses its discretion by exercising ""its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority."" *Id.*, quoting *J. H. v. J. F.*, 2023-Ohio-1416, ¶ 13 (6th Dist.), quoting *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

20.

## B. Termination of the Marriage and Temporary Orders

{¶ 59} Saari's second assignment of error challenges the court's retroactive termination of spousal support to the date of the final hearing. Saari claims that the court erred by retroactively terminating and modifying temporary spousal support without a Civ.R. 75(N) motion pending.

{¶ 60} Civ.R. 75(N) provides for temporary support orders during divorce actions and states:

> (1) When requested in the complaint, answer, or counterclaim, or by motion served with the pleading, upon satisfactory proof by affidavit duly filed with the clerk of the court, the court or magistrate, without oral hearing and for good cause shown, may grant a temporary order regarding spousal support to either of the parties for the party's sustenance and expenses *during the suit*[.]
>
> (2) . . . Upon request, in writing, after any temporary spousal support, child support, or order allocating parental rights and responsibilities for the care of children is journalized, the court shall grant the party so requesting an oral hearing within twenty-eight days to modify the temporary order. A request for oral hearing shall not suspend or delay the commencement of spousal support or other support payments previously ordered or change the allocation of parental rights and responsibilities until the order is modified by journal entry after the oral hearing. (Emphasis added.)

Temporary support awards are intended to preserve the status quo during divorce proceedings. *Grein v. Grein*, 2010-Ohio-2681, ¶ 53 (11th Dist.); *Cangemi v. Cangemi*, 2006-Ohio-2879, ¶ 14 (8th Dist.).

{¶ 61} Saari supports her claim with Ohio case law holding that a court cannot retroactively modify a temporary support order absent a Civ.R. 75(N) motion. In *Fenicle v. Heinze*, 2024-Ohio-2941, ¶ 70-71 (6th Dist.), a trial court erred by, sua sponte,

21.

retroactively modifying a party's child support order to a date earlier than the motion for modification. In *Walpole v. Walpole*, 2013-Ohio-3529 (8th Dist.), ¶ 40-43, no error was found where at the final hearing but subsequent to a Civ.R. 75(N) motion, the trial court modified the retroactive start date of the temporary spousal support order, thereby reducing the arrearage amount.

{¶ 62} These cases are distinguishable in that they relate to a modification, not a termination of support following a final hearing. While temporary spousal support frequently continues until the filing of the divorce decree, there is nothing that requires the trial court in its discretion to continue the obligation beyond the date of the hearing. *Schroeder v. Schroeder*, 2008-Ohio-3875, ¶ 23 (2d Dist.), citing *Harris v. Harris*, 2003-Ohio-5350, ¶ 24 (11th Dist.).

{¶ 63} Here, denying Saari's request for a final spousal support order, the court considered the temporary spousal support payments made by Fieweger over the preceding 36 months, continuing months after the firm trial date, and the limited duration of the parties' marriage. These same considerations support the termination date of the temporary support order to the date of trial.

{¶ 64} Saari similarly argues that the trial court's order that she repay unused tuition was an improper retroactive modification. In its January 2025 decision the court specifically found that under R.C. 3105.171(E)(4), Saari engaged in financial misconduct by failing to use the increased temporary spousal support for her school tuition. The

22.

March 2025 judgment entry ordered that due to the overpayment, $26,250 be deducted from the distributive award.

{¶ 65} R.C. 3105.171(E)(4) provides that "[i]f a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property."  Upon review, the court did not abuse its discretion by ordering the repayment of the unused tuition payments as a sanction for financial misconduct.

{¶ 66} Fieweger's first and second cross-assignments of error contend that the court erroneously set the marriage and temporary orders termination date as the date of the final hearing rather than December 31, 2021, as set forth in the trial court's February 24, 2022 order which provides:

> The Court has again granted Plaintiff's new counsel's motion to withdraw and request for continuance of the firm trial date.  Defendant has an interest in stocks and/or a business that are marital and must be valued for division.  Considering the short length of the parties' marriage, the ever-expanding time this cause has been pending, and the benefit setting a firm date for valuation of the parties' various assets, the Court finds the presumptive dates for the duration of the marriage inequitable.
> Therefore, the duration of the parties marriage shall be defined as June 14, 2017 through December 31, 2021.  The Court finds this date equitable based on the original date of firm trial and the tax nature of the assets for valuation.

23.

{¶ 67} R.C. 3105.171(A)(2) provides that "during the marriage" means whichever of the following is applicable:

(a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;

(b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.

{¶ 68} The statute creates a creates a presumption that the proper termination date of the marriage is the date of the final divorce hearing. *Turner v. Turner*, 2024-Ohio-2200, ¶ 77-78 (6th Dist.), quoting *Budd v. Budd*, 2011-Ohio-565, ¶ 8 (9th Dist.), quoting *Bowen v. Bowen*, 132 Ohio App.3d 616, 630 (9th Dist. 1999). A different date may be used when valuing marital property where the court determines that the default dates would be inequitable. *Jackson v. Jackson*, 2014-Ohio-1145, ¶ 8 (6th Dist.), citing *Chapman v. Chapman*, 2012-Ohio-126, ¶ 17 (6th Dist.).

{¶ 69} Here, the March 2025 judgment entry of divorce lists the marriage termination date as June 21, 2022. While the January 2025 decision utilizes the December 31, 2021 date for the valuation of the parties marital assets and debts, addressing the issue of spousal support, the court specifically found:

The parties were married on July 14, 2017 and trial began June 15, 2022. The court had set an earlier date of December 31, 2021 as a date for asset valuation. The parties' finances remained untangled through date of trial.

24.

Therefore, finds (sic) that the marriage lasted July 14, 2017 until the date of trial, June 15, 2022[2]; a period of 5 years.

**{¶ 70}** Thus, while the judgment entry of divorce lists the statutory, de facto termination date and fails to specifically differentiate between the dates used for asset valuation and marriage duration, any error is harmless because it is clear from the judgment that the court relied on the proper dates in making the various awards.

**{¶ 71}** Based on the foregoing, Saari's second assignment of error and Fieweger's first and second cross-assignments of error are not well-taken.

### C. Distributive Award

**{¶ 72}** Saari's first assignment of error challenges the court's calculation of her distributive award. Fieweger acknowledges that the trial court failed to provide an accounting of the distributive award.

**{¶ 73}** It is well-settled that, although a trial court has broad discretion to value marital property, it is not free to omit valuation altogether. *Quigley v. Quigley*, 2004-Ohio-2464, ¶ 92 (6th Dist.), citing *Schuller v. Schuller*, 1997 WL 51223 (6th Dist. Feb. 7, 1997). When dividing marital property, "'the trial court must indicate the basis for its award in sufficient detail to enable a reviewing court to determine that the award is fair, equitable and in accordance with the law.'" *Quigley* at ¶ 97, quoting *Kaechele v. Kaechele*, 35 Ohio St.3d 93 (1988), paragraph two of the syllabus. This requirement is

---

[2] The court acknowledges the six-day discrepancy from the dates set in the March judgment entry and the January decision but finds it de minimis.

25.

significant in this case as it involves an unequal division of marital assets. *Green v. Shall*, 2004-Ohio-1653, ¶ 30 (6th Dist.), citing *Szerlip v. Szerlip*, 129 Ohio App.3d 506, 512 (5th Dist. 1998).

{¶ 74} In its judgment entry, the trial court adopted most of the findings of fact contained in the prior judge's January 2025 decision with minor changes due to clerical errors. The court divided the following:

| Saari | Fieweger |
|---|---|
| Real Property: $30,124<br>Vehicle: $30,606<br>Anderson's 401(k): $9,282<br>4 Bank Accts: $2,330<br>Children's Bank Accts: $180,649<br>2 Accts: $9 | Vehicle: $0<br>2 Bank Accts.: $9<br>Welltower 401(k): $261,496<br>9635 Acct.: $267,301<br>Children's Bank Accts.: $8,000<br>Money Market. Acct.: $97,326<br>Vested Stock: $430,651<br>Newly Vested Stock: $316,748<br>Computershare: $76,678 |
| Total: $253,000 | $1,458,209 |

{¶ 75} With the addition of Fieweger's $242,216 bonus from 2021, the marital property totaled $1,935,428.00, with each party entitled to $967,714. According to Saari, she should have received $714,714, but the court limited her distributive award to $367,000.

{¶ 76} Upon review of the record, Saari is correct that the trial court made an unequal division of property without making findings of fact to support such a division.

26.

Because the court's intent is unclear, we find error. Accordingly, Saari's first assignment of error is well-taken.

### D. Newly Vested Stock and Options

{¶ 77} Fieweger's third cross-assignment of error relates to the trial court's award of the newly vested stock. Specifically, the court found 1,939 newly vested shares and assigned them a value of $316,748. Fieweger contends that this is against the weight of the evidence and that the stocks should have been valued at $166,308.03 (1,939 shares at $85.77 per share). Saari counters that the court's decision classifying 3,693 vested stocks and options as marital with a $316,748 value was fully supported by the testimony and exhibits presented during the final hearing. She claims that the court made a clerical error in listing $1,939, rather than 3,693 newly vested shares.

{¶ 78} On Page 4 of its January decision, the court, referencing subsequent page numbers, listed Fieweger's stock and stock options as follows:

VESTED STOCK

| P4 & 5 | 12/31/2021 | 6775 Vested Shares | $581,091.75 |
| | | Only 5021 shares are marital | $430,651.03 |
| | | 1754 Marital Half | $215,325.72 |
| | | Non-Marital Half | $150,440.72 |
| P5 "After" 12/31/21 | | 8714 | |
| | | -6775 | |
| | | 1939 new "vested" shares | |
| 6 49 | Conditional Stock options | date of grant to date of vesting | |
| | | Use coverture formula | |

27.

{¶ 79} As to shares vesting after the December 31, 2021 valuation date but prior to trial, the court noted that certain other options were exercised by Fieweger or became vested. The court then concluded that the three categories of options total 3,693 shares and "must be considered marital property[.]" The court derived its information from Fieweger's Exhibit HH, which provides the shares or exercised options included: 1,024.75 LTIP Grant; 1,056 of Time-Based Restricted stock; and 1,612 Performance Based options all valued at $85.77 per share. This totals $316,748.61. The court then listed, as Fieweger's property, "Newly Vested Stock" with a marital value of $316,748.

{¶ 80} On review, this court cannot reconcile the court's treatment of the newly vested stock options as the same as the newly vested stock, if, in fact, that is what the court intended in light of the discrepancy in the decision.

{¶ 81} Accordingly, Fieweger's third cross-assignment of error is well-taken and on remand the court is instructed to clarify its method valuing the newly vested stocks and stock options.

**E. Unvested Stock and Stock Options**

{¶ 82} Saari's third assignment of error asserts that the trial court erroneously classified various unvested stock and unvested stock options as Fieweger's separate property after determining that their vesting was based on present and future performance only, while ignoring the past performance language. She maintains that the unvested stock began accruing dividends upon granting (and not upon vesting), thus further

28.

evidencing that the award compensates for past, in addition to incentivizing future performance.

{¶ 83} Fieweger counters that the court's findings are supported by trial testimony and the Welltower LTIP. He asserts that if the unvested stock relates to past performance, then the amounts earned need to be recalculated to relate back to his initial employment, years prior to the parties' marriage.

{¶ 84} A party seeking to have an item classified as separate property bears the burden, by a preponderance of the evidence, of tracing that asset to his or her separate property.

{¶ 85} *Bursley v. Bursley*, 2019-Ohio-1556, ¶ 10 (6th Dist.), quoting *Hook v. Hook*, 2010-Ohio-4165, ¶ 19 (6th Dist.). A trial court's factual findings on the classification of marital and separate property pursuant to R.C. 3105.171 are reviewed under a manifest weight of the evidence standard. *Id.* at ¶ 11, citing *Okos v. Okos*, 137 Ohio App.3d 563, 569 (6th Dist.2000). Thus, the court's findings will be upheld if the record contains some competent, credible evidence supporting the trial court's conclusions. *Id.*, citing *Fletcher v. Fletcher*, 68 Ohio St.3d 464, 468 (1994).

{¶ 86} Classifying the unvested stock and options awards as based on present and future performance, the trial court relied on *Heine v. Heine*, 2003-Ohio-7365 (C.P.) and *Chapman v. Chapman*, 2012-Ohio-126 (6th Dist.). Both cases observe that in classifying unvested stock awards a court must determine whether it was earned for past, present or future performance. The awards granted for past and present employment services are

29.

deemed marital property while those granted for future services are not considered marital. *Chapman* at ¶ 28. *Heine* sets forth the following factors to consider in determining whether a stock option grant is based on past, present or future employment:

> "[W]hether the employee stock options or stock retention shares were intended to (1) secure optimal tax treatment, (2) induce the employee to accept employment, (3) induce the employee to remain with the employer, (4) induce the employee to leave his or her employment, (5) reward the employee for completing a specific project or attaining a particular goal, and (6) be granted on a regular or irregular basis." *Davidson v. Davidson*, supra, 254 Neb. at 665, 578 N.W.2d 848.

*Id.* at ¶ 30.

{¶ 87} Here, the court concluded that the unvested stock options were granted for performance and time-passage specifically inclusive of the three-year LTIP grant cycles. The court noted that the noncompete provisions extended beyond the conclusion of the vesting period and may factor future conduct. Distinguishing *Chapman* and *Heine*, the court further found the division equitable based on the limited duration of the parties' marriage.

{¶ 88} On review, the court's determination is supported by Fieweger's testimony as well as evidence in the record including the LTIP documents. Based on the foregoing, Saari's third assignment of error is not well-taken.

### F. Third-Party Valuation

{¶ 89} Fieweger complains in his fourth cross-assignment of error that the trial court lacked authority to order a third-party to value the marital portion of the unvested stock and options. A trial court has broad discretion in "determining the method of

30.

valuing marital property." *Bass v. Bass*, 2002-Ohio-6239, ¶ 50 (6th Dist.), citing *Berish v. Berish*, 69 Ohio St.2d 318, 319 (1982). In valuing marital property courts have appointed experts to appraise assets that were not valued or had disputed values. *Freytag v. Freytag*, 2024-Ohio-2403, ¶ 45 (3d. Dist.), citing *Wingard v. Wingard*, 2005-Ohio-7066, ¶ 43 (2d Dist.); *Robinson v. Robinson*, 1990 WL 237200, *2-3 (5th Dist. Dec. 18, 1990); *Kette v. Kette*, 1997 WL 760668, *1 (9th Dist. Nov. 12, 1997); *Ruff v. Ruff*, 1995 WL 311721, *1 (11th Dist. Apr. 7, 1995); *Ranck v. Ranck*, 1991 WL 69361, *1 (12th Dist. Apr. 19, 1991).

{¶ 90} The court's order that Colleen Dooley compute a coverture fraction for the unvested stock and options in order to determine the marital portion of the unvested stock and options falls squarely within its discretion. Based on the foregoing, Fieweger's fourth cross-assignment of error is not well-taken.

## G. Inconsistency

{¶ 91} Fieweger's fifth cross-assignment of error contends that the trial court erred by issuing a judgment entry inconsistent with its own findings of fact and conclusions of law and going beyond the bounds of Civ.R. 60(A). Specifically, the January 2025 decision awarded the value of the Computershare account to Saari while the March 2025 judgment entry awarded it to Fieweger.

{¶ 92} Based upon our disposition of Fieweger's sixth cross-assignment of error, below, Fieweger's fifth cross-assignment of error is moot and not well-taken.

31.

## H. Computershare Account

**{¶ 93}** In his sixth cross-assignment of error, Fieweger argues that the trial court's decision assigning any intrinsic or marital value to the Computershare account was erroneous and against the manifest weight of the evidence. Fieweger claims that the 894 shares of time-based restricted stock were accounted for in the Fidelity investment report. The shares had the same February 16, 2021 issue date and the same number of shares. Saari claims that these facts are not determinative and that Welltower's response to her counsel's subpoena neither specifies the type of stock nor the grant or vesting dates. Further, her expert while acknowledging the possibility that Computershare held the stocks as recordkeeper but that the same stocks appear in the Fidelity statements, stated that though the number of shares were the same he saw no evidence of any transfer to Fidelity or of them being duplicative.

**{¶ 94}** Fieweger's Fidelity investment report shows a February 16, 2021, 894-share restricted stock grant. A Computershare June 11, 2022 account statement provides under "RESTRICTED-UNVRSA" that on February 16, 2021 Fieweger was issued 894 shares of restricted stock. We find that these statements are duplicative and the court erred in assigning any separate value to the Computershare account. Fieweger's sixth cross-assignment of error is well-taken.

## I. Custodial Accounts

**{¶ 95}** In his seventh cross-assignment of error, Fieweger asserts that the trial court abused its discretion by determining that Saari had a $104,118 separate property

32.

interest in her and her children's joint bank accounts which had a $285,000 approximate total value. The court found $180,000 to be marital property. Fieweger claims that that court's computation conflicts with its finding that Saari committed financial misconduct by transferring marital funds into each of Saari's and her children's joint accounts and that that "the children's accounts are considered marital property."

{¶ 96} Reviewing the testimony and documentary evidence presented at trial, the record supports the court's conclusion that $180,000 of the children's accounts was marital property. Three, $60,000 transfers were made into each account just prior to Saari filing for divorce with sums she admitted were marital. The remaining sums are traceable to child support payments from the same bank account being transferred into the children's accounts. Fieweger's seventh cross-assignment of error is not well-taken.

### J. Treble Damages

{¶ 97} Fieweger's eighth and final cross-assignment of error claims that the trial court erred by failing to impose treble damages after finding that Saari committed financial misconduct. During pending divorce proceedings, R.C. 3105.171(E)(3) requires that each spouse "disclose in a full and complete manner all marital property, separate property, and other assets, debts, income, and expenses of the spouse."

{¶ 98} Under R.C. 3105.171(E)(4), a trial court may compensate an offended spouse with a distributive award or with a greater award of marital property if a spouse has "engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets."

33.

{¶ 99} Similarly, under R.C. 3105.171(E)(5):

If a spouse has *substantially and willfully* failed to disclose marital property, separate property, or other assets, debts, income, or expenses as required under division (E)(3) of this section, the court may compensate the offended spouse with a distributive award or with a greater award of marital property not to exceed three times the value of the marital property, separate property, or other assets, debts, income, or expenses that are not disclosed by the other spouse. (Emphasis added.)

{¶ 100} A challenge to a trial court's finding of a party's financial misconduct in a divorce action is reviewed under a manifest weight of the evidence standard. *Reed v. Reed*, 2023-Ohio-756, ¶ 11 (3d Dist.), citing *Guagenti v. Guagenti*, 2017-Ohio-2706, ¶ 84 (3d Dist.). Where a trial court finds that a party has committed financial misconduct, a reviewing court will "not reverse an award to compensate for financial misconduct absent an abuse of discretion." *Id*. at ¶ 13, citing *Guagenti* at ¶ 84. *See Epperson v. Epperson*, 2015-Ohio-2443, ¶ 41 (6th Dist.).

{¶ 101} Here, the court found that Saari engaged in financial misconduct by misusing the HSA and ordered her to reimburse Fieweger $1,334.11; by transferring marital funds into her children's accounts- the decision finding that $180,000 of the total was marital property; and that she falsely stated that she needed an increase in temporary spousal support for tuition expenses ordering her to repay the $1,250 monthly sum from the effective date through the temporary spousal support termination date.

{¶ 102} Reviewing the record and the court's findings, we cannot find that the court abused its discretion by failing to award treble damages under R.C. 3105.171(E)(5). Fieweger's eighth cross-assignment of error is not well-taken.

34.

## IV. Conclusion

**{¶ 103}** Upon due consideration, the judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, is affirmed, in part, and reversed, in part. The matter is remanded to the trial court to issue findings of fact relative to the parties' distributive awards, excluding consideration of the Computershare account, and to clarify its award relative to the newly vested stock and options. Pursuant to App.R. 24, the parties will equally share in the cost of this appeal.

Judgment affirmed, in part,
reversed, in part, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.

_____
JUDGE

Christine E. Mayle, J.

_____

Charles E. Sulek, J.                                   JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.